## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**JASON P.,**[1]

      **Plaintiff,**

                                         **Case No. 1:21-cv-5323**

      **v.**                              **Magistrate Judge Norah McCann King**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**

      **Defendant.**

## OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Jason P. for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq*. Plaintiff appeals from the final decision of the Commissioner of Social Security denying that application.[2] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f). For the reasons that follow, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

On April 30, 2018, Plaintiff filed his application for benefits, alleging that he has been disabled since February 17, 2017. R. 77–78, 166–68. The application was denied initially and

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as Defendant in her official capacity. *See* Fed. R. Civ. P. 25(d).

upon reconsideration. R. 103–07, 112–14. Plaintiff sought a *de novo* hearing before an

administrative law judge ("ALJ"). R. 115. ALJ Daniel Shellhamer held a hearing on February

27, 2020, at which Plaintiff, who was represented by counsel, testified. R. 41–60. In a decision

dated July 7, 2020, the ALJ concluded that Plaintiff was not disabled within the meaning of the

Social Security Act from April 30, 2018, the date on which the application was filed, through the

date of that decision. R. 21–35. That decision became the final decision of the Acting

Commissioner of Social Security when the Appeals Council declined review on February 26,

2021. R. 1–7. Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On

July 20, 2021, Plaintiff consented to disposition of the matter by a United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF

No. 11.[3] On April 20, 2022, the case was reassigned to the undersigned. ECF No. 28. The matter

is ripe for disposition.

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the

authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204

F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to

determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d

Cir. 2000); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has

explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative
> record and asks whether it contains sufficien[t] evidence to support the agency's

---

[3]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases
seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot
Project (D.N.J. Apr. 2, 2018).

factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account

whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ's decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Absent

such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record.  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).

## B. Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. § 416.920(a)(4). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. § 416.920(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 416.920(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 416.920(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.* at § 416.909. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 416.920(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 416.920(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the

impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.     ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 34 years old on April 30, 2018, the application date. R. 34. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between that date and the date of the decision. R. 23.

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: cervical and lumbar degenerative disc disease, cervical radiculopathy, migraines, demyelinating disease, obesity, depressive disorder, anxiety disorder, panic disorder, and neurocognitive disorder. *Id.*  The ALJ also found that Plaintiff's diagnosed asthma and benign essential hypertension were not severe impairments. R. 23–24.

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 24–26.

At step four, the ALJ found that Plaintiff had the RFC to perform light work subject to various additional limitations. R. 26–34. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a warehouse worker. R. 33–34 (explaining further that the vocational expert classified as "other work" Plaintiff's work as a cable installer, sales agent/business service, and electronic equipment repairer because Plaintiff "did not perform them long enough to satisfy the SVP requirements of the jobs").

At step five and relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs–*e.g.,* jobs as a produce weigher, a routing clerk, and an office helper– existed in the national economy and could be performed by Plaintiff. R. 34–35. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act

from April 30, 2018, the date on which Plaintiff's application was filed, through the date of the decision. R. 35.

Plaintiff disagrees with the ALJ's findings at steps four and five; he also challenges the constitutionality of the appointment of the Commissioner of Social Security and the impact of that appointment on the decision at issue in this case. He asks that the decision be reversed and remanded with directions for the granting of benefits or, alternatively, for further proceedings. *Plaintiff's Memorandum of Law,* ECF No. 15; *Plaintiff's Reply Brief*, ECF No. 27. The Acting Commissioner takes the position that her decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 25.

## IV.   SUMMARY OF RELEVANT MEDICAL EVIDENCE

### A.   Shaila Bokkala-Pinninti, D.O., Ph.D.

On May 14, 2018, Shaila Bokkala-Pinninti, D.O., Ph.D., Plaintiff's treating neurologist, completed a two-page, check-the-box, and fill-in-the-blank form entitled "Medical Source Statement of Patient's Ability to Perform Work-Related Physical Activities." R. 538–39. In response to the question how long Plaintiff can sit, stand, and walk in an eight-hour workday, Dr. Bokkala-Pinninti wrote "N/A". R. 538. Dr. Bokkala-Pinninti opined that Plaintiff could walk one city block without resting or experiencing severe pain; could continuously sit and stand for 30 minutes at a time, after which he must walk, stand, and stretch; and could stand for 30 minutes, after which time he must sit and lie down. *Id*. Plaintiff could sit and stand/walk for a total of less than two hours in an eight-hour workday. *Id*. According to Dr. Bokkala-Pinninti, Plaintiff's severe pain requires that he taken ten unscheduled breaks, each lasting 20 minutes, during an

average workday. *Id*. She further opined that Plaintiff could occasionally lift and carry less than 10 pounds in a competitive work situation. *Id*. Dr. Bokkala-Pinninti also opined that Plaintiff could use his hands for repetitive action such as simple grasping, pushing and pulling, and fine manipulation, and could use his feet for such repetitive movements as operating foot controls. R. 539. Plaintiff could occasionally bend, stoop, squat, crawl, climb, and reach above shoulder level, although Dr. Bokkala-Pinninti noted that doing so "may cause pain – cervical spondylosis with radiculopathy." *Id*. Plaintiff has "moderate" restrictions in the following activities: working at unprotected heights, being around moving machinery, driving automotive equipment, being exposed to marked changes in temperature, humidity, dust, and fumes, because Plaintiff has "dizziness & vertigo & cervicogenic migraine[.]" *Id*. Plaintiff would likely be absent from work approximately five days a month and his migraines would occasionally interfere with the attention and concentration needed to perform even simple work tasks during a typical workday. *Id*. Finally, Dr. Bokkala-Pinninti opined that "medications may limit his ability to drive heavy machinery." *Id*.

On the same day, Dr. Bokkala-Pinninti also completed a two-page, multiple-choice, and check-the-box form entitled "Clinical Assessment of Pain." R. 540–41. Dr. Bokkala-Pinninti selected the following response: "Pain is present to such an extent as to be distracting to adequate performance of daily activities or work." R. 540. Physical activity such as walking, standing, bending, stooping, moving of extremities, etc., would "likely" "[g]reatly increase[ ]" the degree of pain experienced by Plaintiff, "and to such a degree as to cause distraction from the task or even total abandonment of the task." Addressing the degree to which medication(s) could be expected to affect Plaintiff, Dr. Bokkala-Pinninti selected this response: "Some side effects can be expected, but will only be mildly troublesome." *Id*. Asked to what extent Plaintiff's pain

would affect his ability to perform routine tasks on a productive basis (*i.e.*, perform at production levels expected by most employers) on a sustained basis, over an 8-hour day for a number of weeks without frequent absences, Dr. Bokkala-Pinninti chose the following answer: "Pain can be expected to be severe and to limit effectiveness due to distraction, inattentiveness, drowsiness, etc." *Id*. Asked to opine as to Plaintiff's long-term prospects of recovery in regard to his pain, Dr. Bokkala-Pinninti selected this response: "Although the level of pain may be less intense or less frequent in the future, it will still remain a significant element in this individual's life." R. 541. According to Dr. Bokkala-Pinninti, treatments for pain (*e.g.*, biofeedback, nerve stimulation, injections) "have had no appreciable impact or have only briefly altered the level of pain that this patient experiences." *Id*. Finally, Dr. Bokkala-Pinninti opined that Plaintiff "rarely" (meaning 1% to 5% of an eight-hour workday) experiences symptoms that interfere with the attention and concentration needed to perform even simple work tasks during a typical workday. *Id*.

On February 12, 2020, Dr. Bokkala-Pinninti completed a six-page, check-the-box, and fill-in-the-blank form entitled, "Multiple Sclerosis Residual Functional Capacity Questionnaire." R. 696–701. The doctor indicated that she saw Plaintiff every six months. R. 696. Asked whether Plaintiff actually suffered from multiple sclerosis, Dr. Bokkala-Pinninti did not check the box "Yes" or "No," but instead provided the following response: "So far workup questionable for MS & so yet definitively confirmed[.]" *Id*. Asked how the MS diagnosis was made, Dr. Bokkala-Pinninti responded that it was "still being worked up." *Id*. Dr. Bokkala-Pinninti indicated that Plaintiff's prognosis was fair and listed Plaintiff's symptoms as fatigue, weakness, unstable walking, and numbness/tingling or other sensory disturbances. *Id*. She denied that Plaintiff was a malingerer. *Id*. Plaintiff did not have significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait

and station or that he had significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process. R. 697. Asked the approximate dates of exacerbations of multiple sclerosis in the prior year, Dr. Bokkala-Pinninti responded, "N/A No definitive DX of MS." *Id*. She indicated that Plaintiff complains of a type of fatigue that is best described as lassitude rather than fatigue of motor function, which is typical of MS patients, but Dr. Bokkala-Pinninti qualified that response by writing "could be." *Id*. Dr. Bokkala-Pinninti denied that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations, and indicated that Plaintiff's impairments (physical or any emotional impairments) were reasonably consistent with the symptoms and functional limitations described in her evaluation. *Id.* According to Dr. Bokkala-Pinninti, Plaintiff's experience of pain, fatigue, or other symptoms were frequently severe enough to interfere with his attention and concentration. R. 698. She also opined that Plaintiff could tolerate moderate stress, explaining that "[p]hysical exam is normal." *Id*. According to Dr. Bokkala-Pinninti, Plaintiff's impairments had lasted or were expected to last at least twelve months and that the earliest date to which Plaintiff's symptoms and limitations applied was three years. *Id*. In a competitive work situation, Plaintiff could walk three to four city blocks without rest and could sit for 30 minutes at a time before needing to change position. Dr. Bokkala-Pinninti provided no response to questions relating to Plaintiff's abilities to stand at one time, to stand/walk total in an eight-hour workday, to shift positions at will, nor did she indicate whether Plaintiff would need to take work breaks or to elevate his legs with prolonged sitting, how many pounds that Plaintiff could lift and carry, how often Plaintiff could twist, stoop/bend, crouch, climb ladders, climb stairs, or whether Plaintiff had any significant

11

limitations in repetitive reaching, handling, or fingering. R. 699–700. According to Dr. Bokkala-Pinninti, Plaintiff should avoid even moderate exposure to extreme cold, extreme heat, wetness, humidity, and noise, and he should avoid all exposure to fumes, odors, dusts, gases, poor ventilation, etc. and hazards (machinery, heights, etc.). R. 701. Finally, Dr. Bokkala-Pinninti opined that Plaintiff would likely be absent from work more than four days per month as a result of his impairments or treatment of those impairments. *Id.*

### B. Samuel Sarmiento, M.D.

On July 31, 2018, Samuel Sarmiento, M.D., performed a consultative neurological examination of Plaintiff. R. 609–16. Dr. Sarmiento noted that Plaintiff reported social security benefits based on migraine headaches and seizures. R. 609. Plaintiff reported that "he had a seizure twice, one in mid and late 2017. He states that he became unconscious and was shaking and was brought to the emergency room and was discharged. He was diagnosed with seizure disorder in June 2017 by the neurologist. He is not on any seizure medication." R. 610. Plaintiff reported that he was taking the following medications: Propranolol, tramadol, Prozac, clonazepam, and Flexeril. *Id.* Under the heading, "Functional Status," Dr. Sarmiento noted as follows: "He has a valid driver's license. He can drive by himself. He can climb up and down a few steps. He is unable to walk a block." R. 611. Dr. Sarmiento observed that Plaintiff was well-nourished and in no acute distress, was able to get one and off the examining table, was able to dress himself, and was comfortable in a seated position during the interview. *Id.* Upon examination of the extremities and the spine, Dr. Sarmiento noted as follows:

<u>Upper Extremities</u>
Evaluation of the upper extremities showed full range of motion of the shoulders, elbows, wrists, and hands bilaterally. Pinch strength and grip strength were 5/5 bilaterally. Muscle strength of the upper extremities, including the biceps and triceps, were graded at 5/5 bilaterally. The claimant was able to extend his fingers, make a fist, and oppose the thumbs bilaterally. There was no atrophy, rigidity,

involuntary movements or tremor.

### Lower Extremities
Evaluation of the lower extremities showed full range of motion of the hips, knees, and ankles bilaterally. Muscle strength was 5/5 in the lower extremities in hip flexion, leg flexion, leg extension, ankle dorsiflexion, and ankle plantar flexion bilaterally.

      *            *            *

### Cervical Spine
Evaluation of the cervical spine showed decreased range of motion on flexion at 40 degrees, extension at 40 degrees, side-bending (lateral flexion) at 35 degrees bilaterally, and rotation at 60 degrees bilaterally. There was cervical tenderness. The cervical spine showed a normal lordotic curve.

### Lumbar Spine
Evaluation of the lumbosacral spine showed decreased range of motion on extension at 10 degrees. There was lumbar tenderness. The lumbar spine showed a normal lordotic curve. There was a negative straight leg raising test both in supine and sitting positions.

*Id*. Dr. Sarmiento went on to perform a neurological evaluation, noting as follows:

### Evaluation of Cranial Nerves
**II:** Visual acuity is normal. Visual fields are intact to confrontation. Pupillary light reflex was intact. Pupils were equal, round, and reacted to light and accommodation.

**III, IV, VI:** Extra-ocular movements were full throughout, without nystagmus. No ptosis.

**V:** The motor and sensory function of the trigeminal nerve was intact.

**VII:** There was no facial asymmetry. The examinee was able to smile, frown, raise his eyebrows, close his eyes against resistance, and puff out both cheeks.

**VIII:** The examinee was able to hear finger rubs bilaterally.

**IX:** The gag reflex was not tested.

**X:** The palate and uvula elevate symmetrically bilaterally.

**XI:** The Spinal Accessory Nerve motor function to the Sternocleidomastoid and Trapezius muscle was intact bilaterally.

**XII:** The tongue was midline and mobility was normal without atrophy or fasciculations.

R. 614. There was decreased sensation to touch and pinprick in the right arm and decreased sensation to touch and pinprick on the right leg and decreased sensation to touch in the right side of the face. *Id.* Plaintiff's biceps, triceps, and brachioradialis deep tendon reflexes were 2+ bilaterally and symmetric; patella and Achilles deep tendon reflexes were 2+ bilaterally and symmetric; pathological reflexes, including Babinski's, were negative bilaterally. *Id.* Plaintiff was able to walk with a normal gait and without a limp; he did not require the use of an ambulation aide and was able to heel walk, toe walk, and squat without difficulty; his hand-eye coordination was good. *Id.* Romberg testing was normal with both eyes open and closed and finger to nose and rapid alternating movement test were normal in both upper extremities. *Id.* Upon mental evaluation, Dr. Sarmiento noted that Plaintiff was awake, alert, and oriented times 2; he was cooperative during the examination, and had a normal mood, affect, and concentration. *Id.* There was no abnormality of thought processing and contact; he was unable to spell "world" backward; and his short-term memory was 1/3 objects recalled after five minutes, but his long-term memory was intact. R. 612, 614. Plaintiff's speech was clear and coherent; his thought process was goal-directed; his comprehension and repetition functions were intact; there was no aphasia, stuttering, or involuntary vocalizations; and there was no evidence of right-left confusion. R. 612. Dr. Sarmiento diagnosed migraine headaches and a history of seizures. *Id.* Dr. Sarmiento summarized his findings and opinions as follows:

**SUMMARY**

The claimant is a 35-year-old male, blood pressure 130/85, pulse 88, respiration 18, right-handed. He is not in any distress. here are no significant motor impairments of his upper extremities. He was able to handle fine and gross manipulation, including the handling of fine and small objects. Grip strength and pinch strength was 5/5 and equal bilaterally. There are no significant motor deficits in his lower extremities. He has decreased sensation to touch and pinprick in the right arm and

decreased sensation to touch and pinprick in the right leg. He ambulated well without the use of any handheld devices. He has decreased sensation to touch in the right side of the face. His mental evaluation is oriented times 2. His short-term memory is 1/3.

**CONCLUSION**
He would be able to walk and stand for a reasonable amount of time with needed breaks. He would be able to sit for a reasonable amount time with needed breaks. No significant balance limitations were observed during the evaluation. He has good functionality of his right and left hands. He would be able to handle fine and small sized objects. He has no significant limitations to fingering such as picking and pinching objects.

*Id*. When completing a "Passive Range of Motion Chart" as part of the neurological examination,

Dr. Sarmiento indicated that Plaintiff had 5/5 bilateral grip strength and 5/5 bilateral pinch

strength and he indicated that Plaintiff could fully extend his hands, make a fist with his hands;

and could oppose his fingers on both hands, separate papers, and button buttons. R. 615. Plaintiff

had lateral flexion 35/75; flexion 40; and extension 40. *Id*. Straight leg raising test in the supine

position was 50 on the right and left. R. 616. Plaintiff was able to squat, walk on his heels, walk

on his toes, and walk at a reasonable pace without a hand-held assistive device. *Id*.

On December 12, 2018, Dr. Sarmiento conducted another consultative neurological

examination. R. 652–58. Dr. Sarmiento noted that Plaintiff had applied for social security

benefits based on his seizures and migraine headaches. R. 652. Plaintiff reported a diagnosis of

seizures in 2014 and that they occur only when sleeping. *Id*. Plaintiff reported one seizure every

couple of months, the most recent in October 2018 and July 2018. R. 652. Dr. Sarmiento noted

that an April 2017 MRI showed hyperintensity compatible with demyelinating disease, but no

evidence of active demyelination. *Id*. Plaintiff also reported a diagnosis of migraine headaches in

2014 and that he experiences headaches every day, each lasting 5 to 24 hours. R. 653. Plaintiff

stated that he had been to the emergency room for headaches twice that year and three times in

the prior year. *Id*. Although he cannot do simple laundry and simple cleaning, he can go to a

store or office by himself or with someone else, can feed himself, make simple meals, dress himself and take off and put on his shoes; he can brush his teeth and can shower or bathe. *Id.* Upon physical examination, Dr. Sarmiento noted that Plaintiff was well nourished and in no acute distress; was able to get on and off the examining table; could dress himself; and was comfortable in a seated position during the interview. R. 654. Upon examination of the extremities and the spine, Dr. Sarmiento found as follows:

**Upper Extremities**
There was no significant spasticity, rigidity, involuntary movements, or tremor. Evaluation of the upper extremities showed full range of motion of the shoulders, elbows, wrists, and hands bilaterally. Pinch strength and grip strength were 5/5 bilaterally. Muscle strength of the upper extremities, including the biceps and triceps, were graded at 5/5 bilaterally. There is decreased sensation to touch and pinprick in the left arm and the left hand. Biceps, triceps, and brachioradialis deep tendon reflexes were 2+ bilaterally symmetric.

**Lower Extremities**
There was no significant spasticity, rigidity, involuntary movements, or tremor. Evaluation of the lower extremities showed full range of motion of the hips, knees, and ankles bilaterally. Muscle strength was 5/5 in the bilateral lower extremities, including gluteus, ileo-psoas, quadriceps, hamstrings, calf, and dorsiflexors. Patella and Achilles deep tendon reflexes were 2+ bilaterally symmetric. There is decreased sensation to touch and pinprick in the left leg and the left foot.

   *           *           *

**Cervical Spine**
Evaluation of the cervical spine showed decreased flexion at 40 degrees, decreased extension at 30 degrees, decreased lateral flexion at 30 degrees bilaterally, and decreased rotation at 60 degrees bilaterally. There was cervical tenderness. The cervical spine showed a normal lordotic curve.

**Lumbar Spine**
Evaluation of the lumbosacral spine showed decreased flexion at 30 degrees, decreased extension at 10 degrees, decreased lateral flexion at 10 degrees bilaterally, and decreased rotation at 10 degrees bilaterally. There is lumbar tenderness. The lumbar spine showed a normal lordotic curve. There was no lower back pain or radicular symptoms on sitting straight leg raising maneuver test. There was no lower back pain or radicular symptoms on supine straight leg raising maneuver test.

16

*Id*. On neurological evaluation, Dr. Sarmiento found as follows:

> **<u>Evaluation of Cranial Nerves</u>**
> **II:** Visual acuity: Right 20/30, left 20/25, both eyes 20/25 without glasses. Visual fields were intact to confrontation. Pupillary light reflex was intact. Pupils were equal, round, and reacted to light and accommodation.
>
> **III, IV, VI:** Extra-ocular movements were full throughout, without nystagmus. No ptosis.
>
> **V:** The motor and sensory function of the trigeminal nerve was intact.
>
> **VII:** There was no facial asymmetry. The examinee was able to smile, frown, raise his eyebrows, close his eyes against resistance, and puff out both cheeks.
>
> **VIII:** The examinee was able to hear finger rubs bilaterally.
>
> **IX:** The gag reflex was not tested.
>
> **X:** The palate and uvula elevate symmetrically bilaterally.
>
> **XI:** The Spinal Accessory Nerve motor function to the Sternocleidomastoid and Trapezius muscle was intact bilaterally.
>
> **XII:** The tongue was midline and mobility was normal without atrophy or fasciculations.

R. 655. Plaintiff could walk with a normal gait without a limp; he did not require the use of an ambulation aide and was able to heel walk, toe walk, and squat without difficulty; his hand-eye coordination was good. *Id*. Romberg testing was normal with both eyes open and closed and finger to nose and rapid alternating movement test were normal in both upper extremities. *Id*. Upon mental examination, Dr. Sarmiento noted that Plaintiff was awake, alert, and oriented to time, place, and person; was cooperative during the examination; had a normal mood, affect, and concentration. *Id*. There was no abnormality of thought processing and thought contact; he was able to spell "world" backward; his short-term memory was intact with 2/3 objects recalled after five minutes; and his long-term memory was intact. *Id*. His speech was clear and coherent; his thought process was goal-directed; his comprehension and repetition functions were intact; there

was no aphasia, stuttering, or involuntary vocalizations; and there was no evidence of right-left confusion. *Id*. Dr. Sarmiento diagnosed seizures, migraine headaches, and hypertension (directing Plaintiff to seek immediate medical attention). *Id*. Dr. Sarmiento summarized his findings and opinions as follows:

> **SUMMARY**
> Claimant is a 35-year-old male who is not in any distress. Blood pressure 168/96, pulse 76. There is no significant motor impairment of both upper extremities. There is decreased sensation to touch and pinprick in the left arm and left hand. He was able to handle fine and gross manipulations, including the handling of fine and small objects. Grip strength and pinch strength were 5/5 equal bilaterally. There is no significant motor deficits of both lower extremities. There is decreased sensation to touch and pinprick in the left leg and left foot. He ambulated well without the use of any handheld devices. In addition, his mental status is oriented x3. His short-term memory is 2/3. He was able to spell the word "world" backward. He has a negative Romberg and negative coordination evaluation.
>
> **CONCLUSION**
> He would be able to walk and stand for a reasonable amount of time with needed breaks. He would be able to sit for a reasonable amount time with needed breaks. No significant balance limitations were observed during the evaluation. He has good functionality of his right and left hands. He would be able to handle fine and small sized objects. He has no significant limitations to fingering such as picking and pinching objects.

R. 656.

### C.    Lawrence G. Mintzer, Ph.D.

On August 9, 2018, Lawrence G. Mintzer, Ph.D., conducted a consultative psychological examination. R. 619–23. Plaintiff reported to Dr. Mintzer that he had suffered three separate incidents of head trauma: In 2007, he was a passenger in a vehicle that was struck by a tractor-trailer; in 2014, a shelving unit collapsed, causing a 150-pound nightstand to fall about 9 feet and strike Plaintiff; and in May 2015, while unloading a truck, a 150-pound recliner sofa fell on his head and neck. R. 619. Upon mental status examination, Dr. Mintzer noted that Plaintiff was oriented to person, place, and time; was casually dressed and adequately groomed; his motor

18

activity was appropriate and relaxed; his speech and mood were within normal limits; and his affect was appropriate to the situation. R. 621. Plaintiff had never experienced either auditory or visual hallucinations; his thought processes were goal-directed, and his speech was coherent with no indications of any delusional thoughts. *Id*. There was no evidence of any homicidal or suicidal thoughts and Plaintiff had never attempted suicide. *Id*. There were no ideas of reference or phobias. *Id*. Plaintiff's abstract thinking was fairly good, his fund of general knowledge was fair, and his capacity to perform simple calculations was good. *Id*. Dr. Mintzer characterized Plaintiff's concentration as fair (*e.g.*, he performed serial sevens just a bit slowly, making one error while doing them). *Id*. Plaintiff was able to correctly spell the word "world" forwards, but could not correctly spell it backwards. *Id*. Dr. Mintzer estimated that Plaintiff's intelligence was in the average range. *Id*. Plaintiff's remote memory was good, but his recent memory was poor: he was able to recall none of three items after one minute and after five minutes. *Id*. He was unable to recall what he had eaten for dinner on the evening prior to the examination. *Id*. Plaintiff's immediate retention and recall were fair to somewhat poor (*e.g*, he was able to repeat four digits forward and four digits in reverse). *Id*. Dr. Mintzer characterized Plaintiff's impulse control as fair (*e.g.*, when he got angry at himself, he sometimes yelled). *Id*. His social judgment was poor (*e.g.*, if he found an envelope on the street that was sealed, addressed, and had a new stamp, he would "ignore it"). *Id*. Dr. Mintzer characterized Plaintiff's insight as good. *Id*. Dr. Mintzer diagnosed an unspecified depressive disorder, social anxiety disorder, and mild neurocognitive disorder due to traumatic brain injuries. *Id*. Dr. Mintzer assessed the severity of Plaintiff's condition as follows: "[Plaintiff] has an illness that is expected to last for the next 12 months. [Plaintiff's] limitations are caused by a combination of physical health problems, psychological problems, and a mild cognitive impairment. Overall, [Plaintiff's] limitations are

19

moderate to severe in degree." *Id*. According to Dr. Mintzer, Plaintiff's prognosis was guarded, although he was able to manage his personal funds in a competent manner. R. 622.

On January 10, 2019, Dr. Mintzer conducted a second consultative psychological examination. R. 661–65. Dr. Mintzer noted that Plaintiff had never undergone outpatient mental health treatment or psychiatric hospitalization. R. 662–63. Upon mental status examination, Dr. Mintzer noted that Plaintiff was oriented to person, place, and time; was casually dressed and adequately groomed; his motor activity was appropriate and relaxed; and his speech was normal. R. 663. Dr. Mintzer noted that Plaintiff seemed a bit depressed and his affect was mildly constricted. *Id*. Plaintiff had never experienced either auditory or visual hallucinations; his thought processes were goal-directed, and his speech was coherent with no indications of any delusional thoughts. *Id*. There was no evidence of any homicidal or suicidal thoughts and Plaintiff had never attempted suicide. *Id*. Plaintiff did not experience any ideas of reference. *Id*. However, Plaintiff "experiences anxiety when he leaves his house. He experiences anxiety when he is out in public." *Id*. According to Dr. Mintzer, Plaintiff's abstract thinking was fairly good; his fund of general knowledge was fair; and his capacity to perform simple calculations was fair. *Id*. Plaintiff's concentration was fair, and he was able to correctly spell the word "world" forwards, but could not correctly spell it backwards. *Id*. Dr. Mintzer estimated that Plaintiff's intelligence was in the average range. *Id*. Plaintiff's remote memory was good, but his recent memory was poor. Plaintiff's immediate retention and recall were poor. Plaintiff's impulse control was good and his social judgment was fair; his insight was good. *Id*. Dr. Mintzer assessed the severity of Plaintiff's condition as follows: "[Plaintiff] has an illness that is expected to last for the next 12 months. [Plaintiff's] limitations are caused by a combination of physical health problems, psychological problems, and a mild cognitive impairment. Overall, [Plaintiff's]

limitations are moderate to severe in degree." R. 664. According to Dr. Mintzer, Plaintiff's prognosis was guarded although he was able to manage his personal funds in a competent manner. *Id.*

## V.    DISCUSSION

### A.    RFC, Medically Determinable Impairments, and Opinion Evidence

Plaintiff argues that substantial evidence does not support the ALJ's RFC for a limited range of light work because the ALJ failed to properly consider Plaintiff's history of seizures, tremors, and post-concussion syndrome; failed to properly evaluate his mental impairments at different stages of the sequential evaluation; and failed to properly consider the opinion evidence in the record. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 11–26; *Plaintiff's Reply Brief*, ECF No. 27, pp. 1–11. For the reasons that follow, Plaintiff's arguments are not well taken.

A claimant's RFC is the most that the claimant can do despite his limitations. 20 C.F.R. § 416.945(a)(1). At the administrative hearing stage, it is the ALJ who is charged with determining the claimant's RFC. 20 C.F.R. § 416.946(c); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.") (citations omitted). When determining a claimant's RFC, the ALJ has a duty to consider all the evidence. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, the ALJ need include only "credibly established" limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014) (stating that the ALJ has discretion to choose whether to include "a limitation [that] is supported by medical evidence, but is opposed by other evidence in the record" but "[t]his discretion is not unfettered—the ALJ cannot reject evidence of a limitation for an unsupported reason" and stating that "the ALJ also has the discretion to

21

include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible").

In the case presently before the Court, the ALJ determined that Plaintiff had the RFC to perform a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; avoid all exposure to temperature extremes, unprotected heights and moving mechanical parts; able to understand, remember, and carry out simple routine instructions and simple work related tasks in a low stress work environment, defined as only occasional changes to settings, processes, and tools, and occasional independent decision making; goal oriented rather than production paced tasks; and occasional interaction with the public, supervisors, and coworkers.

R. 26. In making this determination, the ALJ detailed years of medical evidence including, *inter alia*, a 2007 motor vehicle accident that resulted in post concussive syndrome after a closed head injury; MRIs that confirmed cervical and lumbar degenerative disc disease and EMGs that confirmed cervical radiculopathy; a 2015 work injury in which a heavy sofa fell on his head; treatment in 2016 for chronic migraines, neck pain, and anxiety; an April 2017 MRI of the brain that showed T2/flair hyperintensities consistent with demyelinating disease and a CT scan that showed a focus of hypoattenuation in the deep subcortical white matter of the right parietal lobe likely due to prior demyelination; a May 2018 examination that revealed marked tenderness over the occipital region of the head, decreased cervical and lumbar range of motion, and marked tenderness, muscle spasm, weakness of the right arm, and tenderness of the right shoulder, positive impingement, decreased right shoulder range of motion, and positive straight leg raising; Dr. Sarmiento's July and December 2018 consultative examinations that revealed decreased cervical and lumbar range of motion, tenderness, and decreased sensation in the right arm and leg, and left arm, hand, leg and foot, but strength of 5/5, a normal gait, negative straight leg

raising, and otherwise normal neurological evaluations; the fact that Plaintiff reported during a

January 2019 evaluation that he felt better subjectively, but that he still had some residual

intermittent localized neck pain and stiffness; that he was able to get on and off the examination

table and change positions without discomfort, had full cervical range of motion, intact reflexes,

strength of 5/5, good grip and pinch strength and intact sensation; that although Plaintiff had

subjective complaints, there were no positive objective findings on physical examination; during

a neurological evaluation that same month, Plaintiff reported neck and lumbar pain, daily head

pain, and coldness in his upper extremities and positive Tinel's, variable sensation in the upper

extremities, and lumbering gait without ataxia; however, the examination suggested mild ulnar

neuropathy but demonstrated no objective neurological findings and no objective evidence of

cervical radiculopathy or migraines; that Plaintiff, who is 6 feet tall, is obese, weighing 290

pounds in October 2019. R. 27–30. The ALJ went on to explain his RFC determination as

follows:

> Based on the foregoing, the undersigned finds the claimant has the above residual
> functional capacity assessment, which is supported by the available medical
> evidence of record since the application date. The claimant has remote history of
> work related injuries with resultant degenerative disc disease, radiculopathy,
> migraines, and demyelinating disease. The claimant is also obese. He has had
> various workers' compensation evaluations, but limited treatment since the
> application date. The most recent workers' compensation evaluations showed no
> positive objective medical findings. The claimant appears to manage his chronic
> pain and migraines with primary care follow up and medication management alone.
> He has had no pain management care, surgeries, injections, or hospitalizations for
> his impairments. Accordingly, his residual pain and obesity would be
> accommodated by restrictions for light work with additional postural and
> environmental limitations. No additional limitations are warranted based on the
> claimant's limited treatment since the application date.
>
> While the physical examinations suggest some limitations in the upper extremities
> due to radiculopathy, generally the claimant has had intact strength throughout with
> only intermittent loss of sensation. Any limitations in the upper extremities can be
> accommodated by light lifting restrictions. Manipulative limitations are not
> warranted as there is a lack of any positive objective medical findings or EMG's

23

since the application date. The most recent examinations in 2019 show no neurological deficits and even suggest that radiculopathy is not consistent with his examination. Therefore, the assigned limitations in the above residual functional capacity accommodate all of the claimant's objective limitations.

Similarly, the claimant's mental impairments have been managed by primary care follow up and medications alone. There is no outpatient or inpatient psychiatric treatment since the application date and no cognitive treatment for the claimant's neurocognitive disorder. The claimant remains functional in daily activities with assistance from his mother. His mental status examinations suggest that limitations for simple low stress work with limited social interactions are appropriate. No additional limitations are warranted based on his lack of treatment.

In finding the claimant's allegations to be only partially consistent with the claimant's subjective allegations, the undersigned finds that the claimant retains the residual functional capacity for light simple work outlined above.

R. 33. In the view of this Court, this record contains substantial evidence to support the ALJ's RFC determination. *See Zirnsak*, 777 F.3d at 615; *Rutherford*, 399 F.3d at 554.

Plaintiff, however, challenges this determination on a number of bases. Plaintiff first argues that the ALJ failed to properly consider his history of seizures. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 14–15; *Plaintiff's Reply Brief*, ECF No. 27, pp. 1–2. Specifically, Plaintiff complains that the ALJ erred in not finding that history to be severe at step two of the sequential evaluation process and "made no mention of how" this impairment was considered at step four. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 14–15. For her part, the Acting Commissioner notes that the ALJ expressly considered Dr. Sarmiento's diagnosis of seizures at step four and, although Dr. Sarmiento diagnosed Plaintiff's seizures based on Plaintiff's own report, that physician did not assess any seizure-related limitations. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 25, p. 23 (citations omitted). The Acting Commissioner also notes that the state agency reviewing medical consultants considered Plaintiff's history of seizures when finding that Plaintiff could perform a range of light work with postural and environmental limitations, opinions that the ALJ found to be persuasive. *Id*. Plaintiff replies that

"just because the State Agency medical consultants considered the Plaintiff's history of seizures, does not automatically make it so that the ALJ considered the Plaintiff's limitations from his seizures simply because he found their opinions persuasive." *Plaintiff's Reply Brief*, ECF No. 27, p. 1. Plaintiff goes on to argue that, although the ALJ may have considered limitations opined by the state agency medical consultants, "the only diseases mentioned by the ALJ in his defense of the RFC's physical limitations are Plaintiffs degenerative disc disease, radiculopathy, migraines, obesity, and demyelinating disease[,]" leaving subsequent reviewers unclear whether the limitations from his seizures were considered or ignored altogether. *Id.* (citing R. 33).

Although the ALJ did not discuss Plaintiff's seizure history at step two of the sequential evaluation process, R. 23–24, any error in this omission is harmless because the ALJ continued to evaluate Plaintiff's seizures, or the manifestations of that impairment, through the remainder of the five-step sequential evaluation process. R. 26–35; *cf. Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (finding that, even if the ALJ had erroneously concluded that other impairments were not severe at step two, any such error is harmless where the ALJ found in the claimant's favor at step two); *Hicks v. Colvin*, No. 2:15-cv-07221, 2016 WL 8674251, at *8 (D.N.J. Oct. 14, 2016) ("Even if the ALJ had in fact erred with respect to one of the impairments that she found to be non-severe, such error would be harmless since she found other impairments to be severe, engaged in the full five-step evaluation, and accounted for related possible limitations in her RFC finding."). At step four, the ALJ expressly discussed that Plaintiff believed that he had a seizure while sleeping in April 2017, and while Plaintiff followed up for treatment of seizures, an EEG was normal. R. 28. The ALJ also acknowledged that Plaintiff reported seizures to Dr. Sarmiento during the latter's consultative examination and that, although Dr. Sarmiento diagnosed Plaintiff with seizures and migraines based on Plaintiff's self-

reports, the examination was otherwise generally normal. R. 29. Notably, as the Acting

Commissioner points out, Dr. Sarmiento assessed no seizure-related functional limitations. R.

609–16; 652–58. Moreover, the ALJ was persuaded by the findings of the state agency reviewing

medical consultants who expressly considered Plaintiff's history of seizures but nevertheless

concluded that Plaintiff could perform a range of light work with postural and environmental

limitations. R. 32, 66–67, 69–71, 75, 87, 90–93, 96. Plaintiff complains that the ALJ's finding

that these state agency opinions were persuasive does not establish that the ALJ properly

considered Plaintiff's limitations resulting from his seizures; however, Plaintiff cites to no

medical evidence documenting how this condition impairs his functioning or results in greater or

different restrictions than those found by the ALJ and which would lead to a different outcome.

Accordingly, the ALJ's failure to expressly discuss Plaintiff's seizure history at step two, and his

discussion of that history is, at most, harmless error and does not require remand. *See Shinseki v.

Sanders*, 556 U.S. 396, 409–10 (2009) ("[T]he burden of showing that an error is harmful

normally falls upon the party attacking the agency's determination. . . . [T]he party seeking

reversal normally must explain why the erroneous ruling caused harm."); *Rutherford*, 399 F.3d at

553 (finding that "a remand is not required here because it would not affect the outcome of the

case"); *Chetoka v. Colvin*, No. CIV.A. 13-941, 2014 WL 295035, at *13 (W.D. Pa. Jan. 27,

2014) ("Although Plaintiff is correct that the ALJ did not provide a discussion of her alleged

sleep disturbances, hypertension, and bipolar disorder, this omission was not error. . . . None of

the sources that examined Plaintiff or her medical records attributed any limitations to these

alleged impairments.").

Next, Plaintiff argues that the ALJ erred in failing to find at step two that Plaintiff's

tremors are severe and complains that the ALJ did not discuss those tremors at step four when

fashioning the RFC. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 14–15; *Plaintiff's Reply Memorandum*, ECF No. 27, pp. 2–4. According to Plaintiff, the record indicates that he has postural and action tremors in his hands, "much more prominent in the right hand, diffuse pain, and fatigue in addition to essential tremors in his sleep." *Plaintiff's Memorandum of Law*, ECF No. 15, p. 14 (citations omitted). Plaintiff further contends that, when he wakes up after a tremor, his joints are clenched, his head is foggy, and he is unable to concentrate. *Id*. at 14–15 (citations omitted). Plaintiff argues that, although he was prescribed propranolol for his tremors, "it has been ineffective." *Id*. at 15 (citations omitted). Plaintiff goes on to argue that the ALJ "made no mention of how" he considered this impairment when crafting the RFC. *Id*. In response, the Acting Commissioner points out that the ALJ acknowledge that Plaintiff's neurologist noted that Plaintiff had mild postural tremors in his hands during an examination in April 2018.

*Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 25, p. 23. The Acting Commissioner also notes that the ALJ considered Dr. Sarmiento's July and December 2018 consultative examinations which revealed no involuntary movements or tremors and that Plaintiff enjoyed normal coordination full grip strength, and the ability to engage in fine and gross manipulation. *Id*. (citing R. 611, 653). The ALJ also found persuasive Dr. Sarmiento's opinion that Plaintiff had good functionality of his hands, could handle fine and small sized objects, and had no significant limitation in fingering, such as in picking up and pinching objects. *Id*. (citing R. 612, 656). The ALJ explained that manipulative limitations were not warranted because of the lack of objective medical findings or EMGs since the date on which Plaintiff filed his application for benefits. *Id*. at 23–24 (quoting R. 33). Plaintiff argues in reply that "there is no requirement that a person with tremors must be diagnosed using objective medical findings." *Plaintiff's Reply Brief*, ECF No. 27, p. 2 (quoting "<u>Essential tremor – Diagnosis and treatment –</u>

<u>Mayo Clinic</u>," which states, *inter alia*, "There are no medical tests to diagnose essential tremor. Diagnosing it is often a matter of ruling out other conditions that could be causing your symptoms."). Plaintiff further notes that even the ALJ conceded that a neurologist's examination revealed that Plaintiff suffered tremors and that the record reflects that he had postural and action tremors in his hands. *Id.* at 3. Plaintiff goes on to argue that the Acting Commissioner's reliance on Dr. Sarmiento's physical examination findings amounts to *post hoc* rationalization and does not cure the ALJ's error in failing to discuss Plaintiff's tremors and associated limitations. *Id*. at 3–4.

The Court is not persuaded that this issue requires remand. As a preliminary matter, for the reasons previously discussed, any error in failing to discuss Plaintiff's tremors at step two is harmless where the ALJ did not deny Plaintiff's claim at that step and went on to evaluate Plaintiff's tremors, or the manifestations of that impairment, at step four. R. 28–29, 31; *cf. Salles*, 229 F. App'x at 145 n.2; *Hicks*, 2016 WL 8674251, at *8. At step four, the ALJ specifically considered that Dr. Bokkala-Pinninti's April 2018 neurological evaluation revealed, *inter alia*, mild postural tremors in Plaintiff's hands.[4] R. 28. The ALJ also considered Dr. Sarmiento's examination findings, including, *inter alia*, that Plaintiff had "had good functionality of his right and left hands. He would be able to handle fine and small sized objects. He had no significant limitations to fingering such as picking and pinching objects[,]" which the ALJ found persuasive. R. 31. The ALJ further explained that "[m]anipulative limitations are not warranted as there is a lack of any positive objective medical findings or EMG's since the application date." R. 33. In

---

[4] Although Plaintiff asserts that his tremors were "much more prominent in the right hand," *Plaintiff's Memorandum of Law*, ECF No. 15, p. 14 (citing R. 554, 557), the cited pages actually reflect that Dr. Bokkala-Pinninti actually found the tremors in the "left [were] much more prominent than the right." R. 554; 557 (same). Plaintiff is right-hand dominant. R. 501, 611, 668.

other words, the ALJ considered Plaintiff's tremors, as well as any manifestations of that impairment, when fashioning the RFC.

Although Plaintiff asserts that the propranolol prescribed for his tremors "has been ineffective[,]"*Plaintiff's Memorandum of Law*, ECF No. 15, p. 15 (citing R. 557, 677); *Plaintiff's Reply Memorandum*, ECF No. 27, p. 3 (same), Plaintiff's citations do not support this assertion. Plaintiff's first citation reflects that Dr. Bokkala-Pinninti prescribed propranolol for Plaintiff's tremors and migraine headaches. R. 557. However, Plaintiff's second citation refers to an unsigned letter from Scott R. Sharetts, M.D., marked "DRAFT" across every page of the letter. R. 671–79. Even setting aside that this unsigned draft letter apparently does not reflect the final findings and opinions of this physician, the cited page simply indicates that propranolol was ineffective in combatting Plaintiff's head pain; there is nothing on the cited page regarding the efficacy of this medication in addressing Plaintiff's tremors. R. 677 ("Cervicogenic headaches as well as a cervical radiculopathy was diagnosed. The head pain begins at the base of the head and radiates to the vertex. Topamax and propranolol were ineffective.").

Similarly, Plaintiff's insistence that there is "no requirement that a person with tremors must be *diagnosed* using objective medical findings[,]" *Plaintiff's Reply Brief*, ECF No. 27, p. 2 (emphasis added), does not militate a different result. Even accepting Plaintiff's assertion in this regard, the ALJ expressly acknowledged at step four Dr. Bokkala-Pinninti's April 2018 finding of hand tremors. R. 28. Moreover, "[a] diagnosis alone . . . does not demonstrate disability." *Foley v. Comm'r of Soc. Sec.*, 349 F. App'x 805, 808 (3d Cir. 2009) (citing *Petition of Sullivan*, 904 F.2d 826, 845 (3d Cir. 1990)); *see also Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) ("[The claimant's] argument incorrectly focuses on the diagnosis of an impairment rather than the functional limitations that result from that impairment. A diagnosis of impairment, by

itself, does not establish entitlement to benefits under the Act"). Notably, Dr. Bokkala-Pinninti

did not articulate any limitations flowing from Plaintiff's hand tremors in her May 2018 report, a

fact that the ALJ expressly considered. R. 30 (discussing Dr. Bokkala-Pinninti's opinion issued

in May 2018, including that she found that Plaintiff "had no limitations with use of his hands or

feet"); *see also* R. 539 (reflecting, *inter alia*, Dr. Bokkala-Pinninti's May 2018 opinion that

Plaintiff can use his hands for repetitive action such as simple grasping, pushing and pulling, and

fine manipulation). As previously discussed, an ALJ need include only "credibly established"

limitations, *i.e.*, limitations that are medically supported or otherwise uncontroverted in the

record. *Rutherford*, 399 F.3d at 554; *see also Grella v. Colvin*, No. 3:12-cv-2115, 2014 WL

4437640, at *18 (M.D. Pa. Sept. 9, 2014) ("[T]he ALJ cannot accommodate limitations which do

not exist, or which cannot be found in the medical record."). For these reasons, the Court is not

persuaded that the ALJ's consideration of Plaintiff's tremors requires remand. *See id.*; *see also*

*Norris v. Kijakazi*, No. 21-CV-2524, 2023 WL 3674308, at *15 (E.D. Pa. May 25, 2023)

("Contrary to Plaintiff's assertions, his tremor does not present any restrictions not accounted for

in the RFC. . . . Plaintiff complains that the 'quantification' of improvement is unknown from the

record, but the absence of any such evidence is not a basis to overturn the ALJ's decision . . . In

short, Plaintiff fails to point to evidence that he lacks even 'good' use of his left hand or that he

is 'significantly' limited in his ability to reach or handle with it").

       In further challenging the RFC determination, Plaintiff also argues that the ALJ erred in

failing to find Plaintiff's post-concussion syndrome severe at step two and that the ALJ did not

discuss how he considered this impairment at step four when fashioning the RFC. *Plaintiff's*

*Memorandum of Law*, ECF No. 15, pp. 14–15; *Plaintiff's Reply Memorandum*, ECF No. 27, pp.

4–5. Plaintiff specifically complains that he has "ongoing headaches, dizziness, and memory loss

due to his post-concussion syndrome[.]" *Plaintiff's Memorandum of Law*, ECF No. 15, p. 15 (citing R. 324, 523). For her part, the Acting Commissioner points out that the ALJ expressly noted that Plaintiff had a remote history of a car accident that resulted in post-concussive syndrome. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 25, p. 25 (citing R. 28). The Acting Commissioner further highlights that the ALJ considered Plaintiff's articulated symptoms (headaches, dizziness, and memory loss) throughout the decision and sufficiently addressed them in the RFC: The ALJ found migraine headaches and a neurocognitive disorder to be severe impairments, discussed the medical evidence relevant to those impairments, and explained how he accounted for Plaintiff's alleged symptoms in the RFC for simple, low stress, light work with additional postural and environmental limitations. *Id.* Plaintiff nevertheless complains in reply that "there is no off-task limitation in the RFC despite the record indicating that the Plaintiff experiences headaches at least 5 times per week." *Plaintiff's Reply Brief*, ECF No. 27, pp. 4–5 (citing R. 585). Plaintiff further complains that the ALJ mentions dizziness only once in the opinion. *Id.* at 5 (citing R. 29). Plaintiff therefore insists that the ALJ "improperly accounted for these limitations in the RFC." *Id.*

Plaintiff's arguments are not well taken. Again, any error in failing to specifically discuss Plaintiff's post-concussion syndrome at step two is harmless where the ALJ did not deny Plaintiff's claim at step two and where the ALJ considered the manifestations of that impairment—headaches, dizziness, and memory loss, per Plaintiff—throughout the rest of the sequential evaluation. R. 24–35; *cf. Salles*, 229 F. App'x at 145 n.2; *Hicks*, 2016 WL 8674251, at *8. Notably, at step four, the ALJ expressly acknowledged that Plaintiff "has a remote history of motor vehicle accident in 2007 resulting in post concussive syndrome after a closed head injury[.]" R. 28. The ALJ further thoroughly considered Plaintiff's chronic migraines and

headaches at step four. R. 27–31, 33. The ALJ also considered Plaintiff's symptom of dizziness. R. 27, 29. The ALJ went on to expressly acknowledge Plaintiff's "remote history of work related injuries"[5] and resultant migraines when explaining why the RFC for simple, low stress, light work with additional postural and environmental limitations sufficiently addressed any limitations flowing from Plaintiff's impairments. R. 26, 33. Although Plaintiff complains that the ALJ failed to include an off-task limitation to accommodate headaches that he asserts occur "at least 5 times per week[,]" *Plaintiff's Reply Brief*, ECF No. 27, pp. 4–5 (citing R. 585), the ALJ properly considered but discounted the intensity, persistence, and limiting effects of Plaintiff's subjective statements in light of the medical record. In addition, Plaintiff's criticism that "the ALJ only mentions the Plaintiff's dizziness one time in the whole opinion[,]" *id*. at 5, does not persuade this Court that the ALJ committed reversible error: The ALJ expressly considered Plaintiff's dizziness twice at step four, R. 27, 29, and further considered that Dr. Sarmiento did not observe any significant balance limitations during his consultative examinations, R. 31. Accordingly, based on this record, the Court concludes that the ALJ adequately considered Plaintiff's manifestations flowing from his post-concussion syndrome.

In continuing to challenge the RFC, Plaintiff contends that the RFC determination is inconsistent with the moderate mental limitations that the ALJ found at step three when conducting the psychiatric review technique ("PRT"). *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 15–18 (citing, *inter alia*, *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004)); *Plaintiff's Reply Memorandum*, ECF No. 27, pp. 5–7. Plaintiff first specifically complains that the RFC does not account for—nor does the ALJ properly explain why the RFC does not account for—his

---

[5] "The [motor vehicle] accident occurred during the course of [Plaintiff's] employment as a truck and safety controller." R. 323; *see also* R. 491 ("During the course of employment the patient was involved in a motor vehicle accident injuring his neck, right shoulder, head/face.").

moderate limitation in his ability to concentrate, persist or maintain pace and fails to include in the RFC needed time off-task, nor does it include a need to avoid work requiring strict quotas. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 16–17; *Plaintiff's Reply Memorandum*, ECF No. 27, pp. 5–6 (citing, *inter alia*, *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198 (3d Cir. 2019)).

      Plaintiff's arguments are not well taken. "[A]s long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" *Hess*, 931 F.3d at 211 (explaining that this conclusion "flows directly from our decision in *Ramirez*"). In the present case, the ALJ's decision offers a "valid explanation" for the finding that a limitation to simple, routine, and repetitive tasks adequately accommodates a moderate limitation in concentration, persistence, or pace. Specifically, when fashioning the RFC, the ALJ expressly relied on, *inter alia*, Dr. Mintzer's August 2018 and January 2019 consultative mental status examinations, which revealed that Plaintiff had normal speech, no hallucinations or delusions, goal directed thoughts, good abstract thinking, and a fair general fund of knowledge; he could perform simple calculations and perform serial sevens slowly and had average intelligence; he had good remote memory. R. 29. The ALJ found persuasive the state agency opinions that Plaintiff, *inter alia*, had moderate limitations in concentration, persistence, and pace, and that Plaintiff is able to persist at tasks that can be learned in one to three months on the job. R. 32. The ALJ also noted that Plaintiff's mental impairments have been managed by only primary care follow up and medications with no outpatient or inpatient psychiatric treatment since the application date and that there has been no treatment for his neurocognitive disorder. R. 33. The ALJ noted that Plaintiff remained functional in his daily activities with assistance from his mother and that "[h]is mental status examinations suggest that limitations for simple low stress work with limited

33

social interactions are appropriate. No additional limitations are warranted based on his lack of

treatment[,]" *id*. Moreover, the ALJ also limited Plaintiff to, *inter alia*, "goal oriented rather than

production paced tasks[.]" R. 26. Based on this record, *Ramirez* does not require remand or

otherwise undermine the ALJ's RFC determination. *See Hess*, 931 F.3d at 214 (finding that

ALJ's explanation was sufficient where the ALJ "highlighted, among other things, the following:

mental status examinations and reports that revealed that Hess could function effectively;

opinion evidence showing that Hess could do simple work; and Hess's activities of daily living,

which demonstrated that he is capable of engaging in a diverse array of 'simple tasks'"); *Long v.

Kijakazi*, No. 20-CV-6336, 2022 WL 1204131, at *14 (E.D. Pa. Apr. 22, 2022) (concluding that

the ALJ provided a valid explanation for finding that the claimant is capable of performing

simple tasks where the ALJ "repeatedly pointed out Plaintiff's 'normal' mental status

examinations[,]" "emphasized Plaintiff's ADLs, which included such tasks as childcare for three

children (including a one-year-old), house cleaning, woodworking, laundry and shopping[,]" and

the claimant's "progress notes consistently showed full orientation, alertness, logical thought

processes, fair or normal insight and judgment, and intact reality testing, decision making,

attention, concentration, and memory"); *Elizabeth F. v. Comm'r of Soc. Sec. Admin.*, No. CV 20-

14632, 2022 WL 798021, at *6 (D.N.J. Mar. 16, 2022) (rejecting the plaintiff's argument that,

where there existed medical opinions that Plaintiff would routinely be off-task, the ALJ did not

adequately translate the moderate mental limitation he imposed on the plaintiff (limitations in

concentration, persistence, or maintaining pace) into the RFC determination where there existed

medical opinion in the record because "the ALJ's RFC assessment adequately explains why the

ALJ believed Plaintiff can perform simple tasks") (citing *Hess*, 931 F.3d at 212).

Plaintiff points to Dr. Bokkola-Pinninti's opinion that, *inter alia*, Plaintiff would need ten unscheduled breaks throughout the day, each lasting 20 minutes. *Plaintiff's Memorandum of Law*, ECF No. 15, p. 16 (citing R. 538); *Plaintiff's Reply Memorandum*, ECF No. 27, p. 5 (same). However, for the reasons detailed below in the discussion addressing Plaintiff's challenges to the ALJ's consideration of the opinion evidence, the ALJ properly discounted Dr. Bakkala-Pinninti's extreme limitations.

In further contending that the ALJ did not adequately accommodate Plaintiff's moderate limitations in concentration, persistence, and pace, Plaintiff contends that a "consultative examiner, Dr. Samuel Sarmiento, whose opinion the ALJ found partially persuasive, opined that the Plaintiff would be able to sit, walk, and stand for a reasonable amount of time with needed breaks (R. 612). This leaves subsequent reviewers unclear whether the ALJ considered this portion of Dr. Sarmiento's opinion or ignored it altogether." *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 16–17; *Plaintiff's Reply Memorandum*, ECF No. 27, pp. 5 – 6 (noting again that the ALJ found Dr. Sarmiento "partially persuasive" and arguing that "while the ALJ did limit the Plaintiff to no more than just unskilled tasks, the ALJ did not limit the Plaintiff regarding time off task despite being overwhelmingly documented by the evidence. Since a valid explanation as to why time off task was not provided by the ALJ despite ample evidence in the record supporting that limitation, this constitutes harmful error warranting remand"). The Court is not persuaded that Dr. Sarmiento's opinion warrants additional restrictions in the RFC, nor is the Court persuaded that the ALJ's failure to incorporate greater restrictions in the RFC warrants remand. The ALJ expressly considered Dr. Sarmiento's opinion and explained that he found that opinion only partially persuasive because that physician did not offer specific functional limitations, as follows:

> Dr. Sarmiento concluded that *the claimant would be able to walk and stand for a reasonable amount of time with needed breaks. He would be able to sit for a reasonable amount time with needed breaks*. No significant balance limitations were observed during the evaluations. He had good functionality of his right and left hands. He would be able to handle fine and small sized objects. He had no significant limitations to fingering such as picking and pinching objects (Exhibits 12F, 19F).

> The opinions of Dr. Sarmiento are partially persuasive. Dr. Sarmiento has extensive program knowledge and he performed two personal examinations of the claimant. His assessment is generally consistent with his examination, *but it is not found to be more persuasive as his assessment is overly vague and did not quantify any specific functional limitations for consideration. Dr. Sarmiento did not offer any specific exertional, postural, or other limitations, but he generally suggested that the claimant had no significant limitations. His statements are overall consistent with his benign examinations, but they are overly vague and nonspecific.*

R. 31 (emphasis added). The Court finds no error with the ALJ's consideration in this regard. *See Kerdman v. Comm'r of Soc. Sec.*, 607 F. App'x 141, 144 (3d Cir. 2015) ("[S]ubstantial evidence supports the ALJ's conclusion that Dr. Frank's opinion was not well-supported, as Dr. Frank failed to reference any objective medical evidence supporting his statements of disability or articulate any specific functional limitations suffered by [the claimant]."); *cf. Daywalt v. Kijakazi*, No. 1:20CV277, 2021 WL 3679304, at *10 (M.D.N.C. Aug. 19, 2021) ("Without quantifying 'a longtime [sic]' (Tr. 564), Dr. Williams's opinion lends little guidance to the ALJ in determining how long Plaintiff could stand."); *Cynthia D. v. Saul*, No. 1:19-CV-03075-JTR, 2020 WL 3620091, at *4 (E.D. Wash. Apr. 28, 2020) ("With respect to Dr. Pellicer's opinion that Plaintiff could stand or walk for six hours in a workday with frequent breaks, Dr. Pellicer failed to explain what she meant by 'frequent.' It is unclear whether she was indicating more frequent breaks than would be normally allowed throughout the workday. Because this statement is vague and imprecise, the Court finds the ALJ was not required to credit or reject it."); *Nixon v. Comm'r of Soc. Sec.*, No. CV 18-1631, 2019 WL 4748058, at *1 (W.D. Pa. Sept. 30, 2019) ("Thus, as Dr. Tran's opinion did not include specific functional limitations and merely opined

as to Plaintiff's limited employability, the Court finds that the ALJ did not err in giving little

weight to that opinion in his analysis."); *Assenat v. Berryhill*, No. 7:15CV00596, 2017 WL

1383941, at *4 (W.D. Va. Mar. 24, 2017) (finding that the opinion that the claimant "needs

frequent rest breaks" is vague).

In contending that the ALJ did not adequately accommodate Plaintiff's moderate mental

limitations, Plaintiff also complains that the RFC would contemplate occasional changes to

settings, processes, and tools even though the ALJ found a moderate restriction in Plaintiff's

ability to adapt or manage himself and the ALJ "even notes in the PRT that the Plaintiff cannot

handle stress or changes in routine." *Plaintiff's Memorandum of Law*, ECF No. 15, p. 17.

Plaintiff's arguments are not well taken. As a preliminary matter, "no incantations are required at

steps four and five simply because a particular finding has been made at steps two and three.

Those portions of the disability analysis serve distinct purposes and may be expressed in

different ways" and, therefore, "the findings at steps two and three will not necessarily translate

to the language used at steps four and five." *Hess*, 931 F.3d at 209. To the extent that Plaintiff

relies on his hearing testimony to support his argument, *Plaintiff's Memorandum of Law*, ECF

No. 15, p. 17 (citing, *inter alia*, R. 56–57), the ALJ properly discounted the intensity,

persistence, and limiting effects of Plaintiff's subjective symptoms for the reasons discussed in

more detail later in this Opinion and Order. Moreover, Plaintiff simply points to this testimony

without explaining what different or additional RFC restrictions it purportedly requires. *See id*.;

*see also Padgett v. Comm'r of Soc. Sec*., No. CV 16-9441, 2018 WL 1399307, at *2 (D.N.J. Mar.

20, 2018) ("[B]ecause Plaintiff has articulated no analysis of the evidence, the Court does not

understand what argument Plaintiff has made here. Plaintiff has done no more than throw down a

few pieces of an unknown jigsaw puzzle and left it to the Court to put them together. The Court

does not assemble arguments for a party from fragments."). In any event, the RFC determination, in addition to limiting Plaintiff to simple routine instructions and simple work, expressly restricts Plaintiff to a "low stress work environment, defined as only occasional changes to setting, processes, and tools, and occasional independent decision making[.]" R. 26. Notably, Plaintiff does not explain why these limitations fail to accommodate his moderate limitations in his ability to adapt or manage himself. *See Plaintiff's Memorandum of Law*, ECF No. 15, p. 17. Based on this record, the Court finds that the RFC adequately addresses Plaintiff's moderate limitation in his ability to adapt or manage himself. *See Richardson v. Saul*, No. CV 21-1359, 2022 WL 16536225, at *2 (E.D. Pa. Oct. 28, 2022) (finding that the ALJ did not err in failing to account for the plaintiff's moderate limitation to adapt or manage herself where the ALJ limited the plaintiff to "only occasional interaction with the general public, coworkers, and supervisors in a low stress environment") (internal quotation marks omitted).

In further challenging the sufficiency of the RFC based on his mental limitations, Plaintiff notes that the ALJ found moderate limitations in Plaintiff's ability to interact with others, but Plaintiff apparently contends that the evidence establishes that he was more limited, warranting greater limitations than occasional interaction with the public, supervisors, and coworkers. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 17–18; *Plaintiff's Reply Memorandum*, ECF No. 27, p. 6. Specifically, Plaintiff points to Dr. Mintzer's diagnosis of agoraphobia and contends that Dr. Mintzer "opined that the Plaintiff experiences anxiety when he leaves his house and when he is out in public." *Plaintiff's Memorandum of Law*, ECF No. 15, p. 17 (citing R. 663). Plaintiff further contends that "[t]he record also reflects that the Plaintiff gets social anxiety, becomes nervous, sweats really bad, and his heart races when he goes to public places such as stores because there are a lot of people." *Id*. at 17–18 (citing R. 620); *see*

38

*also Plaintiff's Reply Brief*, ECF No. 27, p. 6 (citing R. 663[6]). Plaintiff also notes that,

notwithstanding the fact that the ALJ found Dr. Mintzer's opinion overly vague and not

quantifying any specific functional limitations, the ALJ nevertheless found this opinion partially

persuasive, *Plaintiff's Memorandum of Law*, ECF No. 15, p. 18; *see also Plaintiff's Reply Brief*,

ECF No. 27, p. 6 (same), and complains that  the RFC's limitation to occasional interaction with

the public, supervisors, and coworkers is "[c]learly" "inconsistent with Dr. Mintzer's opinion,

leaving subsequent reviewers to question whether these key limitations were considered or

ignored altogether." *Plaintiff's Memorandum of Law*, ECF No. 15, p. 18; *see also Plaintiff's*

*Reply Brief*, ECF No. 27, p. 6 (same).

Plaintiff's arguments are not well taken. The ALJ expressly stated that Dr. Mintzer's

actual opinion was only "partially persuasive" because he did not identify any specific functional

limitations, as follows:

> Dr. Mintzer opined that overall, the claimant's limitations were moderate to severe
> in degree (Exhibits 13F, 20F).

> Similarly, the opinions of Dr. Mintzer are partially persuasive. Dr. Mintzer has
> extensive program knowledge and he performed personal examinations of the
> claimant. His assessment is generally consistent with his examination, but it is not
> found to be more persuasive as his assessment is overly vague and did not quantify
> any specific functional limitations for consideration. Further, while the evidence
> supports moderate limitations in functioning based on Dr. Mintzer's mental status
> examinations, the evidence does not support severe limitations in functioning as the
> claimant has had no mental health treatment or hospitalizations.

R. 31–32. The Court finds no error with the ALJ's consideration of the absence of any specific

functional limitations and lack of mental health treatment in the record. *See Kerdman*, 607 F.

App'x at 144; *cf. Daywalt*, 2021 WL 3679304, at *10; *Cynthia D.*, 2020 WL 3620091, at *4;

*Nixon*, 2019 WL 4748058, at *1; *Assenat*, 2017 WL 1383941, at *4.

---

[6] Plaintiff cites to the wrong page; the information he recounts appears at R. 662.

Although Plaintiff points to Dr. Mintzer's diagnosis of agoraphobia, this Court has already explained that a diagnosis, standing alone, does not demonstrate disability. *Foley*, 349 F. App'x at 808; *Phillips*, 91 F. App'x at 780. Plaintiff's assertion that Dr. Mintzer "opined that Plaintiff experiences anxiety when he leaves his house and is out in public" and that the record reflects evidence of social anxiety do not save Plaintiff's argument. First, Dr. Mintzer did not expressly opine "that Plaintiff experiences anxiety when he leaves his house and is out in public": Instead, Plaintiff's assertion merely reflects Plaintiff's subjective complaints during the examination. R. 620, 662. The mere memorialization of a claimant's subjective complaints in a medical record does not transform those complaints into objective findings or a medical opinion. *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 879 (3d Cir. 2005) ("[A] medical source does not transform the claimant's subjective complaints into objective findings simply by recording them in his narrative report[.]") (summarizing *Craig v. Chater*, 76 F.3d 585, 590 n. 2 (4th Cir. 1996)); *Morris v. Barnhart*, 78 F. App'x 820, 824–25 (3d Cir. 2003) ("[T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion.") (citations omitted); *Famularo v. Comm'r of Soc. Sec.*, No. CV 20-1655, 2021 WL 613832, at *7 (D.N.J. Feb. 17, 2021) ("[A] a claimant's own subjective report about her symptoms[] does not become a medical opinion by virtue of being recorded in treatment notes.") (citations omitted). Second, Plaintiff's additional contention that the record reflects evidence of social anxiety again rests on his own subjective complaints to Dr. Mintzer. R. 620, 662. As discussed in more detail below, the ALJ properly discounted the intensity, persistence, and limiting effects of Plaintiff's subjective symptoms. In any event, the ALJ considered that Dr. Mintzer also noted that, although Plaintiff stated that he did not go out alone because of social anxiety, Plaintiff admitted that he "gets along very well with other people[,]"

occasionally got together with friends, and occasionally saw family members. R. 25, 29; *cf.*

*Hatton*, 131 F. App'x at 880 ("When 'presented with the not uncommon situation of conflicting

medical evidence . . . [t]he trier of fact has the duty to resolve that conflict.'") (quoting

*Richardson v. Perales*, 402 U.S. 389, 399 (1971)). Moreover, the ALJ found the findings of the

reviewing state agency psychological consultants persuasive, including a limitation for simple

low contact work. R. 32. Plaintiff therefore has not persuaded this Court that the ALJ erred in

accommodating Plaintiff's moderate limitation in interacting with others.

In continuing to challenge the RFC determination, Plaintiff contends that the ALJ erred in

his consideration of Dr. Bokkala-Pinninti's opinions and contends that the ALJ failed to consider

the medical opinions of Lewis A. Lazarus, Ph.D., and Edward A. Maitz, Ph.D., ABPN.

*Plaintiff's Memorandum of Law*, ECF No. 15, pp. 18–26; *Plaintiff's Reply Brief*, ECF No. 17,

pp. 7–11. For the reasons that follow, Plaintiff's arguments are not well taken.

For claims filed after March 27, 2017,[7] the regulations eliminated the hierarchy of

medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. § 416.927

*with* 20 C.F.R. § 416.920c(a) (providing, *inter alia*, that the Commissioner will no longer "defer

or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)

or prior administrative medical finding(s), including those from [the claimant's] medical

sources"). Instead, the Commissioner will consider the following factors when considering all

medical opinions: (1) supportability; (2) consistency; (3) relationship with the claimant,

including the length of the treating examination, the frequency of examinations, and the purpose

of the treatment relationship; (4) the medical source's specialization; and (5) other factors,

including, but not limited to, "evidence showing a medical source has familiarity with the other

---

[7] As previously noted, Plaintiff's claim was filed on April 30, 2018.

evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. § 416.920c(c).

The regulations emphasize that "the most important factors [that the ALJ and Commissioner] consider when [] evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id*. at § 416.920c(a). As to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id*. at § 416.920c(c)(1).  As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. at § 416.920c(c)(2).

The applicable regulations further require the ALJ to articulate his "consideration of medical opinions and prior administrative medical findings" and articulate in the "determination or decision how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id*. at § 416.920c(b). "Specifically, the ALJ must explain how he considered the 'supportability' and 'consistency' factors for a medical source's opinion. . . . The ALJ may—but is not required to—explain how he considered the remaining factors." *Michelle K. v. Comm'r of Soc. Sec*., No. 1:19-CV-01567, 2021 WL 1044262, at *4 (W.D.N.Y. Mar. 19, 2021) (citing 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2)).

42

In the present case, the ALJ considered Dr. Bokkala-Pinninti's opinions, but found them "not persuasive[,]" reasoning as follows:

> Shaila Bokkala-Pinninti, D.O., Ph.D., completed a medical report in May 2018. She opined that the claimant could sit and stand for 30 minutes at one time and then must sit or lie down. He could sit, stand and walk for less than 2 hours per day. He would need 10 unscheduled breaks per day. He could occasionally lift and carry less than 10 pounds. He could occasionally bend, stoop, squat, crawl, climb, and reach. He had no limitations with use of his hands or feet. He had moderate restrictions around unprotected heights, machinery, driving, marked changes in temperature and humidity, and exposure to dust, fumes, and gases. He would be absent about 5 days per month. The claimant's pain would cause significant restrictions in daily activities and work performance (Exhibit 10F).

> Dr. Bokkala-Pinninti also completed a multiple sclerosis medical report in February 2020. She acknowledged that workup was questionable for MS and it was not definitively confirmed. There was no confirmed diagnosis of MS. The claimant had a fair prognosis. He had symptoms of fatigue, weakness, unstable walking, and numbness. The claimant's pain, fatigue, and other symptoms would frequently interfere with his attention and concentration. Moderate stress was okay. Physical exam was normal. She opined that the claimant could walk 3 to 4 city blocks and sit for 30 minutes at one time. She found that he should avoid all exposure to fumes, odors, dusts, gases, and hazards, and even moderate exposure to extreme cold or heat, wetness, humidity and noise. He would be absent more than 4 days per month (Exhibit 25F).

> Overall, Dr. Bokkala-Pinninti's opinions are not persuasive. Although she has a longitudinal treating history with the claimant and is familiar with his history, her opinions are overly restrictive. She suggests that the claimant could not even sustain sedentary work. Her proposed postural and environmental limitations are consistent with the overall record and the claimant's combined impairments, as those limitations are supportive of the claimant's chronic pain and migraines. But, she also suggests excessive absences and significant restrictions due to pain despite medications. Those restrictions are not consistent with the record, as the claimant has had no treatment other than primary care treatment in several years. He manages his pain and migraines conservatively with medications alone. Dr. Bokkala-Pinninti also acknowledges that the claimant has no confirmed MS diagnosis, so it is unclear why she is suggesting more than 4 absences per month and what that limitation is based upon. She also suggested 10 unscheduled breaks per day, but she did not explain what objective medical findings support that conclusion. Ultimately, her opinions are not consistent with or supported by the claimant's treating history, which shows limited recent treatment and an overall conservative treating history for his impairments.

R. 30–31; *see also* R. 28 (discussing a neurological evaluation in April 2018, Exhibit 8F, R. 479–

87, which was performed by Dr. Bokkala-Pinninti). As detailed above, the ALJ expressly

acknowledged Dr. Bokkala-Pinninti's long treating relationship with Plaintiff when finding that

this physician's opined postural and environmental limitations were consistent with the record,

but explained why this physician's extreme limitations (which include excessive absences) were

inconsistent with the record, which reflects a conservative treatment history and where the

physician did not point to any objective evidence that supported her opinion in this regard. R.

30–31. The Court finds no error with the ALJ's consideration of this opinion. *See* 20 C.F.R. §

416.920c(c)(1)–(3); *Serrano v. Kijakazi*, No. CV 20-3985, 2021 WL 4477137, at *3–4 (E.D. Pa.

Sept. 30, 2021) ("Here, the ALJ explicitly considered the supportability and consistency factors

relative to Mr. Martelo's opinion by stating that the opinion was not well supported by and was

inconsistent with the mental health records. R. at 27. The ALJ had no further responsibility to

cite to the record, which contained over 1,000 pages."); *Debevits v. Saul*, No. CV 20-600, 2021

WL 2590140, at *4 (W.D. Pa. June 24, 2021) (finding that the ALJ "appropriately assessed Dr.

Kellis' medical opinion in light of these standards" under the applicable regulations, where the

ALJ concluded that a physician's opinion was not persuasive because "the limitations [the

physician] espoused were not consistent with or supported by other evidence of record"). This is

true even though Plaintiff points to contrary evidence that he believes supports the opposite

conclusion. *Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x 199, 201 (3d Cir. 2012) (stating that a

court "will uphold the ALJ's decision even if there is contrary evidence that would justify the

opposite conclusion, as long as the 'substantial evidence' standard is satisfied") (citing

*Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986)); *see also Chandler v. Comm'r of Soc. Sec.*,

667 F.3d 356, 359 (3d Cir. 2011) ("Courts are not permitted to reweigh the evidence or impose

their own factual determinations [under the substantial evidence standard].”); *Hatton*, 131 F. App’x at 880.

　　To the extent that Plaintiff suggests that the ALJ’s consideration of Dr. Bokkala-Pinninti’s opinions is defective because this physician is a specialist in the field for which her opinion is offered, *Plaintiff’s Memorandum of Law*, ECF No. 15, p. 22 (citing 20 C.F.R. 416.927(c)(1), (2), (5), which applies to claims filed before March 27, 2017, which therefore is inapplicable to Plaintiff’s claim); *Plaintiff’s Reply Brief*, ECF No. 27, p. 8 (citing 20 C.F.R. 20 C.F.R. § 416.920c(c)(1), (2), (4)), that argument is not well taken. For the reasons already discussed, the ALJ properly considered the supportability and consistency of Dr. Bokkala-Pinninti’s opinions. R. 28, 30–31; 20 C.F.R. § 404.1520c(1)−(2). Although the ALJ did not expressly discuss Dr. Bokkala-Pinninti’s specialty in neurology, the ALJ specifically considered Dr. Bokkala-Pinninti’s “neurological evaluation in April 2018.” R. 28. In any event, any failure by the ALJ to expressly discuss Dr. Bokkala-Pinninti’s specialty does not require remand where, as here, a comprehensive review of the record provides substantial support for the ALJ’s evaluation of this treating provider’s opinion. *See* 20 C.F.R. § 416.920c(b)(2) (explaining that the factors of supportability and consistency “are the most important factors” and that an ALJ “may, but [is] not required to, explain how” he considered other regulatory factors, including relationship with the claimant, specialization, and other factors); *Jarrett v. Kijakazi*, No. CV 21-1607, 2021 WL 6136936, at *5 (E.D. Pa. Dec. 29, 2021) (finding that the ALJ “satisfied” his regulatory duties when he “explained that the treatment records were only partly consistent with and supportive of” the medical opinion because an ALJ “must only explicitly discuss the two most important factors: consistency and supportability”).

In further challenging the RFC, Plaintiff goes on to complain that the ALJ failed to articulate how he considered the opinions of Edward Maitz, Ph.D., a consultative examiner, licensed psychologist, and diplomate in neuropsychology, and Lewis Lazarus, Ph.D., a neuropsychologist who completed an initial neuropsychological consultation. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 23–24; *Plaintiff's Reply Brief*, ECF No. 27, pp. 8–10. Plaintiff specifically argues as follows:

> Dr. Maitz found that the Plaintiff's pain, fatigue, and emotional factors of anxiety and depression contributed to his cognitive deficits. (R. 322-333). Dr. Maitz specifically determined that the Plaintiff's overall immediate memory skills were in the Low Average range and were significantly less than expected for someone of his overall cognitive abilities because the Plaintiff had difficulty retaining even the limited amount of information he initially remembered. (R. 329). Dr. Maitz also found the Plaintiff's grip strength to be severely impaired. (R. 330). Dr. Maitz also found that the Plaintiff has numbness, tingling, wobbliness in his legs, dizziness, rapid heart rate, unsteady gait, shakiness, and tremulousness. (R. 331).
>
> The Plaintiff also scored a 26 on the Beck Depression Inventory II which reflects a moderate level of depression. (R. 331). The Plaintiff acknowledged that he often feels [sad] and he cries more, has become increasingly self-critical, has lost confidence in himself, feels more discouraged about his future than he previously did, has little interest in people and things, has become more irritable, restless, and agitated, experiences very little pleasure from the things that he previously enjoyed, has a decreased appetite, a marked loss of libido, difficulty sleeping, very little energy, and is too tired or fatigued to do many of the things that he used to do. (R. 331). Dr. Maitz also found that the Plaintiff has difficulty with concentration and decision making. (R. 331). The Plaintiff also scored a 15 on the Beck Anxiety Inventory which is consistent with a mild level of anxiety. (R. 331). The Plaintiff feels somewhat scared, nervous, and unable to relax, and is fearful of something terrible happening or dying. (R. 331). Dr. Maitz also determined that the Plaintiff would become increasingly anxious, depressed, and neuropsychologically debilitated if his symptoms were not successfully treated. (R. 332).
>
> This is consistent with Dr. Lazarus findings. For instance, Dr. Lazarus opined that the Plaintiff's recent and remote memory skills were compromised and his attention and concentration were considered to be deficient. (R. 314-316). Dr. Lazarus also found that the Plaintiff was anxious, hyper for no apparent reason, and that his affect was somewhat dysphoric but also rather flat and emotionless at times. (R. 315). The Plaintiff gets sad when he experiences frequent and persistent headaches and he has difficulty falling asleep as well as frequently awakening during the night.

(R. 315). The Plaintiff excessively worries about his health and is easily startled in cars because he is fearful of getting into another accident. (R. 315).

*Plaintiff's Memorandum of Law*, ECF No. 15, pp. 23–24; *see also Plaintiff's Reply Brief*, ECF No. 25, pp. 9–10. Plaintiff argues that the ALJ's failure to properly consider these opinions is reversible error because their "medical findings are consistent with the record including" Dr. Bokkala-Pinninti's opinions and "[a]t the very least, their findings support that the Plaintiff would be off task, which would necessarily impact his ability to maintain regular and continuing employment." *Plaintiff's Memorandum of Law*, ECF No. 15, p. 24; *see also Plaintiff's Reply Brief*, ECF No. 25, pp. 10–11.

Plaintiff's arguments are not well taken. As a preliminary matter, these physicians conducted their examinations years prior to the alleged disability onset date of February 17, 2017, and the application date of April 30, 2018: Dr. Lazarus performed his evaluation in May 2009 and Dr. Maitz conducted his examination in July 2010. R. 314–16, 322–33. While the ALJ could have considered this evidence, *see Louis v. Comm'r Soc. Sec.*, 808 F. App'x 114, 120 (3d Cir. 2020) (citing *Pirtle v. Astrue*, 479 F.3d 931, 934 (8th Cir. 2007); 20 C.F.R. § 416.912), this evidence was not entitled to controlling or, indeed, to any particular weight. *Cf. Louis*, 808 F. App'x at 120 (finding that the ALJ "was entitled to discount" an opinion letter where the opinion was written before the applicate date and alleged onset date and where it was inconsistent with the medical record); *Dennis-Orshak v. Berryhill*, No. 3:18-CV-15987, 2020 WL 4364330, at *4 (D.N.J. July 30, 2020) (finding that the ALJ did not err in giving no weight to report that predated the alleged onset date) (citation omitted). Moreover, although the ALJ did not expressly discuss these findings, the ALJ did rely on them when acknowledging that Plaintiff "has a remote history of motor vehicle accident in 2007 resulting in post concussive syndrome after a closed head injury[.]" R. 28 (citing, *inter alia*, Exhibit 1F, R. 314–16 (reflecting Dr. Lazarus'

47

evaluation), and Exhibit 3F, R. 322–33 (reflecting Dr. Maitz's evaluation)). In any event, any

error in not expressly discussing the details of these evaluations is, at most, harmless. Plaintiff

insists that these findings "support that the Plaintiff would be off task[,]" *Plaintiff's

Memorandum of Law*, ECF No. 15, p. 24; *see also Plaintiff's Reply Brief*, ECF No. 25, p. 10, but

Plaintiff's contention in this regard is based on simple rank speculation. Neither Dr. Maitz nor

Dr. Lazarus opined that Plaintiff has such a functional limitation. R. 314–16, 322–33. As

previously discussed, an ALJ need include only "credibly established" limitations, *i.e.*,

limitations that are medically supported or otherwise uncontroverted in the record. *Rutherford*,

399 F.3d at 554; *see also Grella*, 2014 WL 4437640, at *18. For these reasons, the Court is not

persuaded that the ALJ's failure to expressly consider the evaluations of Dr. Maitz and Dr.

Lazarus requires remand.

      In his final challenge to the RFC determination, Plaintiff contends that the ALJ and the

Appeals Council did not satisfy their duty to develop the record when they failed to issue a

subpoena to obtain treatment records. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 25–26

(citing 20 C.F.R. § 416.912(b), SSR 17-4p, HALLEX I-2-6-56); *see also Plaintiff's Reply Brief*,

ECF No. 25, p. 11. Plaintiff contends that he asked the ALJ and the Appeals Council to subpoena

treatment records dated from April 13, 2018, "to the present" from Dr. Bokkala-Pinninti, and

records from Susan Lotkowski, D.O. dated from July 20, 2020, the date on which Dr. Lotkowski

began treating Plaintiff, "to the present" *Id.* (citing to R. 294–95, 312–13. Plaintiff contends for

the first time in reply[8] that "the updated records from Dr. Bokkala-Pinninti had a *reasonable*

---

[8] The Court will consider this argument even though it need not address arguments raised for the
first time in a reply brief. *See United States v. Kolodesh*, 787 F.3d 224, 230 n.3 (3d Cir. 2015)
("In support of the arguments raised in his opening brief, Kolodesh raises several new
contentions in his reply brief. Those are waived and we do not address them further."); *United*

*probability* of containing new evidence that *would potentially change the outcome* of the decision and the updated records from Dr. Lotkowski contained medical records that *likely relate back to that period* and are material to the determination." *Plaintiff's Reply Brief*, ECF No. 27, p. 11 (emphasis added).

Plaintiff's arguments are not well taken. "ALJs have a duty to develop a full and fair record in social security cases." *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995). However, "[t]he burden lies with the claimant to develop the record regarding his or her disability because the claimant is in a better position to provide information about his or her own medical condition." *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004) (citations omitted); *see also Crocker v. Comm'r of Soc. Sec.*, No. CV 15-8231, 2017 WL 1181584, at *4 (D.N.J. Mar. 29, 2017) ("[T]he ALJ need not search for all relevant evidence available 'because such a requirement would shift the burden of proof.'") (quoting *Lynn v. Comm'r of Soc. Sec.*, No. 12-1200, 2013 WL 3854460, at *15 (W.D. Pa. July 24, 2013)). "The ALJ's only duty in this respect is to ensure that the claimant's complete medical history is developed on the record before finding that the claimant is not disabled." *Money*, 91 F. App'x at 215 (citing 20 C.F.R. §§ 404.1512(d), 416.912(d)); *see also* SSR 17-4p, 2017 WL 4736894, at *5–6 (Oct. 4, 2017) (providing that the SSA "*may* request existing evidence directly from a medical source or entity that maintains the evidence" under certain limited circumstances and noting that "[a]t the Appeals Council level of review, development of evidence is more limited. The Appeals Council

---

*States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal."); *Wright v. Comm'r of Soc. Sec.*, No. CV 15-6217, 2016 WL 5429649, at *5 (D.N.J. Sept. 27, 2016) (refusing to consider newly-raised argument in the reply brief and citing *Aiellos v. Zisa*, No. 09-3076, 2009 WL 3486301, at *1 (D.N.J. Oct. 20, 2009) ("It is hornbook law that arguments raised for the first time in a reply brief are waived[.]")).

will not obtain or evaluate additional evidence when deciding whether to grant review unless"
"[o]ne of the circumstances listed in 20 CFR 404.970(b) or 416.1470(b)[9] applies and the
individual or his or her representative shows that the evidence is related to the period on or
before the date of the hearing level decision" or "the claim is a title XVI claim that is not based
on an application for benefits (e.g., an age-18 redetermination)") (emphasis added). "[W]here a
claimant is represented by counsel before the ALJ, an ALJ's 'passivity in developing the record

---

[9] This regulation provides as follows:

> In reviewing decisions other than those based on an application for benefits, the
> Appeals Council will consider the evidence in the administrative law judge hearing
> record and any additional evidence it believes is material to an issue being
> considered. However, in reviewing decisions based on an application for benefits,
> the Appeals Council will only consider additional evidence under paragraph (a)(5)
> of this section if you show good cause for not informing us about or submitting the
> evidence as described in § 416.1435 because:
>
> (1) Our action misled you;
> (2) You had a physical, mental, educational, or linguistic limitation(s) that
> prevented you from informing us about or submitting the evidence earlier;
> or
> (3) Some other unusual, unexpected, or unavoidable circumstance beyond
> your control prevented you from informing us about or submitting the
> evidence earlier. Examples include, but are not limited to:
>
> > (i) You were seriously ill, and your illness prevented you from
> > contacting us in person, in writing, or through a friend, relative, or
> > other person;
> > (ii) There was a death or serious illness in your immediate family;
> > (iii) Important records were destroyed or damaged by fire or other
> > accidental cause;
> > (iv) You actively and diligently sought evidence from a source and
> > the evidence was not received or was received less than 5 business
> > days prior to the hearing; or
> > (v) You received a hearing level decision on the record and the
> > Appeals Council reviewed your decision.

20 C.F.R. § 416.1470(b).

will only be sufficient for remand or reversal when it has clearly prejudiced the claimant.'"
*Crocker*, 2017 WL 1181584, at *4 (quoting *Cartagena v. Comm'r of Soc. Sec.*, No. 10-05712, 2012 WL 1161554, at *4 (D.N.J. Apr. 9, 2012)).

In the present case, setting aside the fact that neither of the copies of Plaintiff's counsel's letters addressed to the ALJ and the Appeals Council to which Plaintiff cites is signed, Plaintiff's reliance on these letters does not persuade the Court that this issue gives rise to reversible error. First, the letter directed to the ALJ is dated April 15, 2020, *i.e.*, nearly two months after the administrative hearing held on February 27, 2020 (at which the ALJ said he would "hold the record open for 30 days for additional documents[,]" R. 44), and more than three months before Plaintiff purportedly began treating with Dr. Lotkowski. R. 294–95. Accordingly, and contrary to Plaintiff's implied suggestion in his briefs, this letter could not—and, in fact, did not—ask the ALJ to subpoena treatment records from Dr. Lotkowski. *See id*. Instead, Plaintiff's letter to the ALJ represented that counsel and the Plaintiff "have been unsuccessful in obtaining" information from Dr. Bokkala-Pinninti and asked the ALJ to "exercise [his] subpoena power to obtain" "[t]he anticipated records [that] cover the period April 13, 2018 to present[.]" R. 294.[10] However, nothing in Plaintiff's counsel's April 15, 2020, letter directed to the ALJ, or in Plaintiff's briefs to this Court, explains why the ALJ's discretionary authority to issue a subpoena was warranted based on the present record, the applicable regulations, or SSR 17-4p. To the extent that Plaintiff's conclusory assertion in his reply brief suggests that "the updated records from Dr.

---

[10] The Court notes that the administrative record already contains treatment records from Dr. Bokkala-Pinninti dated, *inter alia*, April 12, 2018. Exhibit 8F, pp. 1–2, R. 479–80; Exhibit 10F, pp. 32–33, R. 552–53. As previously discussed, the ALJ expressly discussed these records. R. 24 ("The objective medical findings show no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication (Exhibit 10F)."), 28 (discussing follow-up for seizures and noting that a video EEG was normal and citing Exhibit 10F; discussing Dr. Bokkala-Pinninti's neurological evaluation and citing Exhibit 8F).

Bokkala-Pinninti had a reasonable probability of containing new evidence that would *potentially change* the outcome of the decision[,]" *Plaintiff's Reply Brief*, ECF No. 27, p. 11 (emphasis added), that speculation will not serve to warrant reversal and remand.

Second, Plaintiff's counsel's December 16, 2020, letter addressed to the Appeals Council renews the request to subpoena records from Dr. Bokkala-Pinninti and asks that the Appeals Council subpoena records from Dr. Lotkowski:

> This is amplification to claimants [sic] brief and arguments in support of reversal or remand submitted on September 8, 2020. At that time claimant made arguments with respect to Mr. [P.]'s application and arguments for reversal or remand. In furtherance of that correspondence I am renewing my request originally made to ALJ Shellhamer on April 15, 2020 where it was requested that the updated records from Dr. Shaila Bookall-Pinninti [sic] of Inspira Neurology be subpoenaed as we were not getting cooperation from that provider nor their vendor for medical records covering the period from April 13, 2018 through the present. (22E) In speaking with Mr. [P.], he has indicated that he is now seeing a new doctor at that facility, Dr. Susan Lotkowski, DO. Dr. Lotkowski began treating the claimant for his prior MS condition in July 20, 2020 and claimant is attaching those initial records for the Councils [sic] review.

> Claimant has also sent an updated request to Dr. Lotkowski for the remaining updated records, and also asked if these records be subpoenaed by the Council. As the records from Inspira Medical go back to April 2018 and contain records that have a reasonable probability of containing new evidence that would change the outcome of the decision and, as the updated records from Dr. Lotkowski contain medical records that likely relate back to that period and are material to the determination, it is respectfully requested that no Appeals Council determination denying remand or reversal be made prior to the receipt of those medical records.

R. 312. Notably, Plaintiff's counsel admits that Plaintiff received some "initial records" from Dr. Lotkowski, which are attached to counsel's letter. *Id*.[11] It is not clear when counsel sent an "updated request to Dr. Lotkowski for the remaining updated records," or if that physician has

---

[11] Notably, these "initial records" from Dr. Lotkowski reflect that, upon examination on July 20, 2020, Plaintiff was, *inter alia*, awake and alert, oriented to person, time, place, with appropriate mood and affect, his recent and remote memory were intact, and he had normal attention, normal concentration, full language, and normal fund of knowledge, and Plaintiff was able to ambulate independently with a normal gait, not antalgic, and normal heel walk and toe walk. R. 15–16.

refused to produce such records, but counsel nevertheless "asked if these records [could] be subpoenaed by the Council." *Id.* In support of the request for the issuance of a records subpoena, Plaintiff's counsel again simply speculates that the requested records from Dr. Bokkala-Pinninti "have a *reasonable probability* of containing new evidence that would change the outcome of the decision" and that updated records from Dr. Lotkowski "*likely* relate back to that period and are material to the determination[.]" *Id.* (emphasis added). Accordingly, as with counsel's April 2020 letter addressed to the ALJ, nothing in this December 2020, letter directed to the Appeals Council—or Plaintiff's briefs—explains why, considering that "[a]t the Appeals Council level of review, development of evidence is more limited[,]" a subpoena was warranted based on the present record, the applicable regulations, or SSR 17-4p. Plaintiff has therefore failed to persuade this Court that the ALJ or the Appeals Council committed reversible error in failing to issue a subpoena for treatment records.

In short, for all these reasons, the Court concludes that the ALJ's findings regarding Plaintiff's RFC are consistent with the record evidence and enjoy substantial support in the record, as does his consideration of the opinions of Dr. Mintzer, Dr. Sarmiento, Dr. Bokkala-Pinninti, Dr. Maitz, and Dr. Lazarus.

## B.   Subjective Statements

Plaintiff also complains that the ALJ failed to properly consider Plaintiff's subjective statements. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 26–29; *Plaintiff's Reply Brief*, ECF No. 27, pp. 11–13. Plaintiff's arguments are not well taken.

"Subjective allegations of pain or other symptoms cannot alone establish a disability." *Miller v. Comm'r of Soc. Sec.*, 719 F. App'x 130, 134 (3d Cir. 2017) (citing 20 C.F.R. § 416.929(a)). Instead, objective medical evidence must corroborate a claimant's subjective

complaints. *Prokopick v. Comm'r of Soc. Sec.*, 272 F. App'x 196, 199 (3d Cir. 2008) (citing 20 C.F.R. § 404.1529(a)). Specifically, an ALJ must follow a two-step process in evaluating a claimant's subjective complaints. SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." *Id.* "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities[.]" *Id.*; *see also Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) ("[Evaluation of the intensity and persistence of the pain or symptom and the extent to which it affects the ability to work] obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.") (citing 20 C.F.R. § 404.1529(c)). In conducting this evaluation, an ALJ must consider the objective medical evidence as well as other evidence relevant to a claimant's subjective symptoms. 20 C.F.R. § 416.929(c)(3) (listing the following factors to consider: daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate pain or other symptoms; treatment, other than medication, currently received or have received for relief of pain or other symptoms; any measures currently used or have used to relieve pain or other symptoms; and other factors concerning your functional limitations and restrictions due to pain or other symptoms). Finally, an "ALJ has wide discretion to weigh the claimant's subjective complaints, *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983), and may discount them where they are unsupported

by other relevant objective evidence." *Miller*, 719 F. App'x at 134 (citing 20 C.F.R. § 416.929(c)); *see also Izzo v. Comm'r of Soc. Sec.,* 186 F. App'x 280, 286 (3d Cir. 2006) ("[A] reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision to discredit a witness.").

In the present case, the ALJ followed this two-step evaluation process. The ALJ specifically considered Plaintiff's subjective complaints. R. 28. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause symptoms, but that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." R. 28. As previously discussed, the ALJ detailed years of medical evidence and record testimony to support his findings, including evidence that, notwithstanding Plaintiff's obesity and remote history of work related injuries with resultant degenerative disc disease, radiculopathy, migraines, and demyelinating disease, he has undergone only limited treatment since the application date; and that he apparently manages his chronic pain and migraines with only primary care follow up and medication management and has undergone no surgeries, injections, or hospitalizations for his physical or mental impairments. R. 27–33. The ALJ therefore found that Plaintiff's "statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because the medical evidence since the application date do[ ] not substantiate the claimant's allegations of disability." R. 28. In the view of this Court, this record provides substantial support for the ALJ's decision to discount Plaintiff's subjective statements as inconsistent with the record evidence. *Van Horn*, 717 F.2d at 873; *Miller*, 719 F. App'x at 134; *Izzo*, 186 F. App'x at 286.

In challenging the ALJ's consideration of Plaintiff's subjective statements, Plaintiff relies on his subjective statements and hearing testimony. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 28–29; *Plaintiff's Reply Brief*, ECF No. 27, pp. 11–12. However, as previously discussed, "[s]ubjective allegations of pain or other symptoms cannot alone establish a disability." *Miller*, 719 F. App'x at 134. Moreover, even to the extent that Plaintiff cites to objective evidence that he believes supports his position, this Court has already explained that it "will uphold the ALJ's decision even if there is contrary evidence that would justify the opposite conclusion, as long as the 'substantial evidence' standard is satisfied." *Johnson*, 497 F. App'x at; *see also Chandler*, 667 F.3d at 359.

For all these reasons, the Court concludes that the ALJ sufficiently explained his reasoning in assessing Plaintiff's subjective complaints, and the ALJ's findings in this regard are supported by substantial evidence in the record and are therefore entitled to this Court's deference. *See* SSR 16-3p; *Miller*, 719 F. App'x at 134; *cf. Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x. 761, 765 (3d Cir. 2009) ("Credibility determinations as to a claimant's testimony regarding pain and other subjective complaints are for the ALJ to make.") (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)); *Davis v. Comm'r Soc. Sec.*, 105 F. App'x 319, 322 (3d Cir. 2004) (finding that the ALJ sufficiently evaluated the plaintiff's testimony where "the ALJ devoted two pages to a discussion of claimant's subjective complaints and cited Claimant's daily activities and objective medical reports"). Accordingly, the ALJ's assessment of Plaintiff's subjective complaints cannot serve as a basis for remand of this action. *Id.*

## C.     Step Five

Plaintiff also challenges the ALJ's determination at step five of the sequential evaluation process, arguing first that the ALJ relied on vocational expert testimony that conflicts with the

Dictionary of Occupational Titles ("DOT") and failed to recognize that conflict, and, second, that the ALJ "violated Agency policy and ignored VE [vocational expert] evidence regarding interacting with supervisors that, if properly considered, would preclude all work." *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 29–33; *Plaintiff's Reply Brief*, ECF No. 27, pp. 13–15. For the reasons that follow, Plaintiff's arguments are not well taken.

At step five, an ALJ must decide whether the claimant, considering his RFC and vocational profile, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 416.920(g). Unlike at the first four steps of the sequential evaluation process, the Commissioner bears the burden of proof at step five. *Hess*, 931 F.3d at 201; *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (citing *Rutherford*, 399 F.3d at 551). "'Advisory testimony from a vocational expert is often sought by the ALJ for that purpose [of determining whether other jobs exist in significant numbers in the national economy that the claimant could perform] . . . and factors to be considered include medical impairments, age, education, work experience and RFC.'" *Id*. at 205–06 (quoting *Rutherford*, 399 F.3d at 551). "Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert." *Podedworny*, 745 F.2d at 218. "Usually, the ALJ will ask whether a hypothetical claimant with the same physical and mental impairments as the claimant can perform certain jobs that exist in the national economy." *Zirnsak,* 777 F.3d at 614 (citing *Podedworny*, 745 F.2d at 218). "While 'the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations,' . . . '[w]e do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant.'" *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (quoting *Rutherford*, 399 F.3d at 554). "[T]o accurately portray a claimant's

impairments, the ALJ must include all 'credibly established limitations' in the hypothetical." *Zirnsak*, 777 F.3d at 614 (citing *Rutherford*, 399 F.3d at 554). Credibly established limitations include limitations "that are medically supported and otherwise uncontroverted in the record." *Rutherford*, 399 F.3d at 554. Moreover, "[l]imitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason." *Id*. (citations and internal quotation marks omitted). A "vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the [ALJ's hypothetical] question accurately portrays the claimant's individual physical and mental" limitations. *Podedworny*, 745 F.2d at 218. Stated differently, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).

"As a general rule, occupational evidence provided by a [vocational expert] should be consistent with the occupational evidence presented in the DOT [Dictionary of Occupational Titles].[12]" *Zirnsak*, 777 F.3d at 617 (citing SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000)). Before relying on the testimony of the vocational expert, an ALJ must "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [vocational experts] and information in the Dictionary of Occupational Titles[.]" SSR 00-4p, 2000 WL

---

[12] The DOT is a "publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy," and which ALJs generally consult to determine whether any jobs exist that a claimant can perform. *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002).

1898704, at *1. "Specifically, an ALJ is required to (1) ask, on the record, whether the [vocational expert's] testimony is consistent with the DOT, (2) 'elicit a reasonable explanation' where an inconsistency does appear, and (3) explain in its decision 'how the conflict was resolved.'" *Zirnsak*, 777 F.3d at 617 (quoting *Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002)). While an "ALJ's failure to comply with these requirements *may* warrant remand in a particular case[,]" "this Circuit has emphasized that the presence of inconsistencies does not mandate remand, so long as 'substantial evidence exists in other portions of the record that can form an appropriate basis to support the result.'" *Id*. (citations omitted) (emphasis added); *see also Jackson v. Barnhart*, 120 F. App'x 904, 905–06 (3d Cir. 2005) ("[E]ven if it was error for the ALJ to fail to solicit testimony about potential conflicts between this portion of the VE's testimony and the DOT, the error was harmless. Where substantial evidence supports the ALJ's opinion and where the failure to solicit the testimony contemplated in SSR 00-4p is harmless, this court will not reverse the ALJ's decision.") (citations omitted).

In the case presently before the Court, the relevant hypothetical question posed by the ALJ, in the form of a written vocational interrogatory to the vocational expert, assumed a claimant with Plaintiff's vocational profile and the RFC found by the ALJ. R. 26, 301. The vocational expert responded that the jobs of produce weigher, routing clerk, and office helper could be performed by such an individual. R. 301–02. The vocational expert also denied that there were any conflicts between the occupational evidence that he provided and the DOT. R. 302. In his written decision, the ALJ relied on this vocational expert evidence in his analysis at step five of the sequential evaluation in finding that Plaintiff could perform jobs that exist in significant number in the national economy that Plaintiff could perform. R. 34–35.

In Plaintiff's first challenge to the step five determination, he contends that the RFC's restrictions to the ability to understand, remember, and carry out simple routine instructions and simple work related tasks are inconsistent with the DOT definitions for routing clerk and office helper, occupations that require reasoning level 2, *i.e.*, an ability to carry out "detailed" instructions, thus requiring remand.[13] *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 30–31; *Plaintiff's Reply Brief*, ECF No. 27, p. 13.

Plaintiff's argument is not well taken. Even accepting Plaintiff's argument relating to two of the three jobs identified by the vocational expert, it must be conceded that at least one job with a reasoning level one exists in significant numbers in the national economy—the job of produce

---

[13] "The qualification categories listed by the DOT for each job include the job's Strength level, General Educational Development ("GED") level, and its Specific Vocational Preparation ("SVP") level." *Zirnsak*, 777 F.3d at 616 (quoting Appendix C, DOT). "GED measures 'those aspects of education (formal and informal) which are required of the worker for satisfactory job performance.'" *Id.* "GED is broken into three categories: (1) reasoning development, (2) mathematical development, and (3) language development. . . . Reasoning levels in the DOT range from level 1 to level 6." *Id.* (citing Appendix C, DOT). GED reasoning level 1 applies "commonsense understanding to carry out simple one- or two-step instructions" in "standardized situations with occasional or no variables in or from these situations encountered on the job." Appendix C, 1991 WL 688702. Reasoning level 2 applies "commonsense understanding to carry out detailed but uninvolved written or oral instructions" in "problems involving a few concrete variables in or from standardized situations." *Id.* Reasoning level 3 applies "commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" in "problems involving several concrete variables in or from standardized situations." *Id.* "SVP levels, on the other hand, measure the skill level necessary to perform a particular job." *Zirnsak*, 777 F.3d at 616 (citing SSR 00–4p, 2000 WL 1898704, at *3 (Dec. 4, 2000)). "SVP levels in the DOT range from level 1 to level 9" and "[t]he DOT skill levels correspond with the second source of information relied on by the Commissioner: the CFR." *Id.* (citing SSR 00–4p). The CFR categorizes occupations into three classes: unskilled, semi-skilled, and skilled. 20 C.F.R. § 404.1568(a)–(c). "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time[,]" while "[s]emi-skilled work is work which needs some skills but does not require doing the more complex work duties," and "[s]killed work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced." *Id.* at § 404.1568(a), (b), (c). "[U]nskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." SSR 00-4p, 2000 WL 1898704, at *3.

weigher, of which approximately 72,000 jobs exist in the national economy—that Plaintiff could

perform. R. 301-02. Thus, the Court need not address Plaintiff's detailed arguments based on a

challenge to jobs requiring reasoning level two. An "ALJ need only establish that a claimant is

capable of performing one job that exists in significant numbers in the national economy."

*Pierznik v. Comm'r Soc. Sec.*, No. 22-2369, 2023 WL 4014468, at *2 (3d Cir. June 15, 2023);

*see also Penrose v. Comm'r of Soc. Sec.*, No. 1:20-CV-00011-NLH, 2020 WL 7640585, at *7

(D.N.J. Dec. 23, 2020) ("At the end of the five-step analysis, an ALJ need only establish that a

claimant is capable of performing one job that exists in significant numbers in the national

economy."). *See also Young v. Astrue*, 519 F. App'x 769, 772 (3d Cir. 2013) ("[T]here is no

precise estimate for what constitutes 'significant numbers' of jobs under the Social Security

Act.") (citing 20 C.F.R. § 404.1566); *Ahmad v. Comm'r of Soc. Sec.*, 531 F. App'x 275, 278 (3d

Cir. 2013) ("In light of our determination in *Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir.1987),

that 200 jobs in the regional economy was a 'clear indication' that other meaningful work in the

national economy existed, we conclude that the ALJ did not err by concluding that the 569 jobs

available as a surveillance system monitor was evidence of other work in significant numbers in

the national economy."); *Emilia N. v. Comm'r of Soc. Sec.*, No. CV 21-18677 (RMB), 2022 WL

14834594, at *8 (D.N.J. Oct. 26, 2022) (noting that, even if the Court accepted that two

identified jobs exited in a lower number of available positions available in the national

economy—547 type copy examiner jobs and 766 loader jobs—"courts in this circuit have

accepted lower figures as evidence of a sufficiently 'significant number of available jobs'")

(citations omitted).

   In his second challenge to the step five determination, Plaintiff argues that, according to

the vocational expert, "[a]ll the occupations [ ] which the VE identified are outside the RFC as

Plaintiff is unable to interact with supervisors or co-workers on a level necessary to maintain competitive employment." *Plaintiff's Memorandum of Law*, ECF No. 15, p. 32 (citing R. 302); *Plaintiff's Reply Brief*, ECF No. 27, pp. 13–14. Plaintiff specifically argues that the RFC's limitation of only occasional contact (occurring very little up to one-third of a work day) with the public, supervisors, and co-workers conflicts with the vocational expert's response to an interrogatory that an individual's inability to interact with a supervisor is work-preclusive. *Id.*

This Court disagrees. The relevant vocational interrogatories and the vocational expert's responses are as follows:

7. Assume a hypothetical individual who was born on October 3, 1983, has at least a high school education and is able to communicate in English as defined in 20 CFR 404.1564 and 416.964, and has work experience as described in your response in question #6. Assume further that this individual has the residual functional capacity (RFC) to perform light work as defined in 20CFR 404.1567(b) and 416.967 (b) except never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; avoid all exposure to temperature extremes, unprotected heights and moving mechanical parts; able to understand, remember, and carry out simple routine instructions and simple work related tasks in a low stress work environment, defined as only occasional changes to settings, processes, and tools, and occasional independent decision making; goal oriented rather than production paced tasks; and occasional interaction with the public, supervisors and co-workers.

8. Could the individual described in item #7 perform any of the claimant's past jobs as actually performed by the claimant or as generally performed in the national economy?

_X_ No (If no, explain how the RFC precludes the performance of each past job as actually performed by the claimant and as generally performed in national economy):

**Response**: Because of exertion either as performed or as described in the Dictionary of Occupational Titles (DOT). Please also note if OCCASIONAL (1/3 of the day, or 2.6 hours in a work day) equates to the following where a hypothetical individual will not be able to interact with a supervisor, this is intolerable and unacceptable in the competitive work environment and would preclude all competitive employment and the occupations noted in this interrogatory. This conclusion is premised on my thirty plus on-going years of experience as a vocational consultant.

R. 301–02. Plaintiff incorrectly assumes that this evidence establishes that he will not be able to interact with a supervisor. However, the ALJ never equated "occasional interaction" with supervisors with "not be[ing] able to interact with a supervisor"; indeed, when crafting the RFC, the ALJ implicitly rejected the alternative definition of "occasional" offered by the vocational expert. R. 26, 34–35, 302. "'[C]ourts routinely find that an individual can perform unskilled work in the national economy, despite a limitation to only occasional interaction with coworkers, supervisors, and the public.'" *Rebecca L. v. Comm'r of Soc. Sec.*, 617 F. Supp. 3d 256, 273 (D.N.J. 2022) (quoting *Torres v. Comm'r of Soc. Sec.*, No. CV 14-6178, 2015 WL 8328346, at *7 (D.N.J. Dec. 8, 2015) (collecting cases)); *see also Vargas v. Saul*, No. 1:19-CV-1858, 2020 WL 2468401, at *7–8 (M.D. Pa. May 13, 2020) (noting that "courts have frequently sustained decisions like the ALJ's determination in this case, which found that a claimant could perform SVP level 2 jobs when the ALJ limited that claimant to occasional interactions with coworkers or supervisors") (collecting cases); *RE: Kathline O. v. Comm'r, Soc. Sec. Admin.*, No. CV SAG-18-3496, 2019 WL 4168961, at *5 (D. Md. Sept. 3, 2019) ("Plaintiff's argument that 'Occasional interaction with others cannot be done on a sustained basis' is logically flawed. . . . The DOT and other relevant sources clearly contemplate that some jobs require some tasks to be performed on a less-than-continuous basis, and there is no error in finding a claimant capable of an activity on an 'occasional' or 'frequent,' rather than 'constant,' basis. The overall job must be performed eight hours per day, five days per week, but each individual task need not."); *cf. Torres v. Comm'r of Soc. Sec.*, No. 15-CV-1382, 2016 WL 3911980, at *11–12 (S.D.N.Y. July 15, 2016) (noting that SSR 85-15 requires, *inter alia*, the ability (on a sustained basis) to respond appropriately to supervision and co-workers and that "[n]one of the nonexertional limits identified by the ALJ[,]" including, *inter alia*,—"no interactions with the public; occasional

work-related interaction with co-workers and supervisors"—"narrows plaintiff's possible range of unskilled work so as to deprive him of meaningful employment opportunities").

Also unavailing is Plaintiff's argument that a restriction to occasional contact with co-workers or the public renders him unable to interact for two-thirds of a day and, therefore, unable to perform work on a sustained basis. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 32–33; *Plaintiff's Reply Brief*, ECF No. 27, p. 15.

Finally, Plaintiff insists that the fact that the ALJ failed to refer to vocational evidence regarding "occasional" interaction and that "*the ALJ specifically asked for post-hearing*" vocational evidence "shows that the RFC as written is disabling." *Plaintiff's Memorandum of Law*, ECF No. 15, p. 32 (emphasis in the original); *see also Plaintiff's Reply Brief*, ECF No. 27, p. 14 (same). This Court disagrees. The fact that the ALJ sought vocational expert evidence following the administrative hearing and did not adopt every alternative in that expert's responses to interrogatories does not establish that substantial evidence does not support the ALJ's RFC or step five finding. Plaintiff's argument is this regard amounts to nothing more than rank speculation and will not serve as a basis for remand. A fair reading of the hearing testimony and the ALJ's decision makes clear that the vocational expert's interrogatory response discussed a different social limitation than the ALJ actually found. The RFC ultimately found by the ALJ enjoys substantial support in the record and the vocational expert evidence upon which the ALJ relied establishes that Plaintiff can perform at least one job that exists in significant numbers in the national economy.

For all these reasons, Plaintiff has not persuaded this Court that remand is required because of any error at step five of the sequential evaluation process.

### D.   Appointment of the Commissioner

Finally, Plaintiff challenges the constitutionality of the appointment of the Commissioner of Social Security, arguing that, because the appointment violated the separation of powers, the decision denying Plaintiff's application for benefits cannot be upheld. *Plaintiff's Memorandum of Law*, ECF No. 15, pp. 32−34; *Plaintiff's Reply Brief*, ECF No. 17, pp. 1−21. This Court, however, has rejected this argument in a different case:

> The Plaintiff alleges that the Social Security proceedings in their entirety were constitutionally defective because of the appointment of Andrew Saul as Commissioner of the Social Security Administration. (ECF 10 at 31). The parties agree that 42 U.S.C. § 902(a)(3) violates the separation of powers clause to the extent that it is construed as limiting the President's authority to remove the Commissioner without cause. (ECF 15 at 36). Plaintiff argues that because of this violation, the appointed ALJ and the Appeals Council did not have constitutional authority to render a decision on Plaintiff's case. (ECF 10 at 32).
>
> While Plaintiff argues to the contrary, the Supreme Court has already stated that there is no basis to conclude that an appropriately appointed official does not have the authority to carry out the functions of the office, even if his or her position was designed by Congress to impermissibly impinge on the President's right to removal at will. *Collins v. Yellen*, ⸺ U.S. ⸺, 141 S. Ct. 1761, 1787-88, 1788 n.23, 210 L.Ed.2d 432 (2021) (plurality opinion) ("As we have explained, there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of his office.").
>
>> The Appointment Clause cases do not help the shareholders either. These cases also ask whether an officer can lawfully exercise the statutory power of his office at all in light of the rule that an office must be properly appointed before he can legally act as an officer.... Here, "[a]ll the officers who headed the FHFA during the time in question were properly appointed." There is thus no barrier to them exercising power in the first instance.
>
> *Id*. at 1793 (Thomas, J. concurring) (citations omitted).
>
> Similarly, the Court addressed that the idea that the "taint" of the "mere existence" of the offending removal provision flows down through the executive power exercised by the officer was unavailing. *Id*. at 1788, 1793 ("[W]e have not held that a misunderstanding about authority results in a constitutional defect where the action was otherwise lawful.").

The plurality opinion addresses the most pressing issue: that there must be an adequate nexus between the unconstitutional provision and the case at bar. *See id.* at 1779 ("for purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of the law that is challenged."). So too do the concurring opinions of Justices Thomas and Kagan: "I write separately because I worry that the Court and the parties have glossed over a fundamental problem with removal-restriction cases such as these: The Government does not necessarily act unlawfully even if a removal restriction is unlawful in the abstract." *Id.* at 1789 (Thomas, J. concurring). Similarly, "[w]hen an agency decision would not capture a President's attention, his removal authority could not make a difference—and so no injunction should issue." *Id.* at 1802 (Kagan, J. concurring). *See also Mor v. Kijakazi*, No. 21-1730, 2022 WL 73510, at *4-5 (D.N.J. Jan. 6, 2022).

The Court must now consider, then, whether Plaintiff has sufficiently established a concrete injury inflicted by 42 U.S.C. § 902(a)(3) upon Plaintiff through the ALJ's final decision of finding the Plaintiff not disabled and the Appeals Council's denial of review. Without standing, there is no "case or controversy" to be decided. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). Plaintiff argues that both the ALJ and the Appeals Council have inflicted the harm of unconstitutional proceedings against Plaintiff and the subsequent denial of benefits. (ECF 10 at 32).

First, the Third Circuit has already expressly stated that "[n]o statutory authority, (the source of the district court's review) authorizes [district courts] to review the Appeals Council decision to deny review," because the Appeals Council exercises "'certiorari-type jurisdiction,'" and renders an ALJ's decision final under the Social Security Act. *Kwasnik v. Kijakazi*, No. 21-08573, 2022 WL 2358424, at *10, 2022 U.S. Dist. LEXIS 116234, at * 30 (D.N.J. Jun. 30, 2022); *see also Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). Thus, this Court does not have the authority to examine the Appeals Council's decision.

Second, the Plaintiff fails to establish a causal connection between the harm of the ALJ's decision and the impermissible removal provision. As discussed above, and as found by other courts, the mere "taint" of the head of an agency does not establish a sufficient nexus for standing. *See Kwasnik v. Kijakazi*, No. 21-08573, 2022 WL 2358424, at *——, 2022 U.S. Dist. LEXIS 116234, at *33-34 (D.N.J. Jun. 30, 2022) (citing *Andino v. Kijakazi*, No. 21-2852, 2022 WL 1135010, at *6-7 (E.D. Pa. April 18, 2022) ("Justice Alito specified in *Collins* that Seila Law's holding on standing 'does not mean that actions taken by such an officer are void *ab initio* and must be undone.' ... [I]t is not difficult to see that *Collins* requires Andino to demonstrate a nexus between the decision denying her disability benefits and 42 U.S.C. § 902(a)(3)."); *Mor v. Kijakazi*, No. 21-1730, 2022 WL 73510, at *5 (D.N.J. Jan. 7, 2022) ("Plaintiff fails to point to any connection between the Commissioner's removal under Section 902(a)(3) and the ALJ's decision (or any other action in this case). As a result, the requisite nexus is not met, and the Court

denies Plaintiff's appeal on this ground."); *see also Ford v. Kijakazi*, No. 21-1432, 2022 WL 1203731, at *6 (E.D. Pa. Apr. 22, 2022) (denying separation of powers claim because plaintiff failed to show "harm caused by Saul exercising authority he retained by virtue of the unconstitutional removal clause.").

As Justice Kagan noted in *Collins*, for the Court to redress an injury due to an agency decision made by an agency headed by a single executive subject to an impermissible for-cause removal protection, that agency's decision would need to "capture a President's attention." *Collins*, 141 S. Ct. at 1801-02. Justice Kagan specifically noted that the "mass" of Social Security Administration decisions would likely not create a harm that would allow for redress. *Id.* ("[O]nly when the President's inability to fire an agency head affected the complained-of decision. Only then is relief needed to restore the plaintiffs to the position they 'would have occupied in the absence' of the removal problem.").

Plaintiff points to a statement by President Biden which purports to indicate that President Biden wanted to fire Commissioner Saul. (ECF 16 at 18). Plaintiff points to the below quote in particular to demonstrate that President Biden wanted to fire the Commissioner from the time of the President's inauguration on January 20, 2021:

> Since taking office, Commissioner Saul has undermined and politicized Social Security disability benefits, terminated the agency's telework policy that was utilized by up to 25 percent of the agency's workforce, not repaired the SSA's relationships with relevant Federal employee unions including in the context of COVID-19 workplace safety planning, reduced due process protections for benefits appeals hearings, and taken other actions that run contrary to the mission of the agency and the President's policy agenda.

*Id.*

First, these harms listed in the news article quote are general and do not show the required concrete, personal, and causal harm required to establish standing. To establish standing, "a plaintiff must show that it has suffered 'an injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" *Collins*, 141 S. Ct. at 1779 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged." *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)); *see also Kwasnik v. Kijakazi*, No. 21-08537, 2022 WL 2358424, at *11 (D.N.J. Jun. 30, 2022).

Plaintiff does not point to a specific legal application, policy, or decision that the ALJ or Appeals Council rendered that had any effect on this case except for the overall denial of benefits, which as explained above was sufficiently supported by

the record. *See Johnson v. Kijakazi*, No. 21-2372, 2022 WL 2342569 at *13, 2022 U.S. Dist. LEXIS 114766 at *36 (E.D. Pa. Jun. 28, 2022) ("Plaintiff has not identified any new regulations, agency policies or directives Commissioner Saul installed that may have affected her claims. Plaintiff thus fails to show how or why [the unlawful] removal clause possibly harmed her.") (internal citations omitted). The unconstitutionality of 42 U.S.C. § 902(a)(3)'s removal restriction simply does not void the ALJ's decision in this mine-run case. The adjudication process and determination by the Social Security Administration remains valid.

*John G. v. Comm'r of Soc. Sec.*, No. 1:21-CV-17256-NLH, 2022 WL 3678108, at *10–12

(D.N.J. Aug. 25, 2022). *See also Sheree J. v. Kijakazi*, No. 1:21-CV-05477-NLH, 2022 WL

3211415, at *8–11 (D.N.J. Aug. 9, 2022) (same); *Rebecca L. v. Comm'r of Soc. Sec.*, No. 1:21-

CV-13848, 2022 WL 3025908, at *13–14 (D.N.J. July 31, 2022) ("Accordingly, Plaintiff has not

alleged any connection between the unconstitutional removal provision in § 902(a)(3) and the

ALJ's decision denying Plaintiff benefits, and nothing commands us to vacate the decisions

below on that ground. . . . Thus, while the removal clause in § 902(a)(3) violates the separation

of powers, it does not independently require the Court to remand or reverse the ALJ's decision

absent a showing of compensable harm.") (internal quotation marks and citations omitted);

*Daniel M. v. Comm'r of Soc. Sec.*, No. CV 21-10533 (RMB), 2022 WL 2952912, at *5–7 (D.N.J.

July 26, 2022) ("Plaintiff has failed to show a sufficient nexus between the unconstitutional

removal restriction and the ALJ's decision.") (internal quotation marks and citations omitted);

*Margaret S. v. Kijakazi*, No. CV 21-13556 (SDW), 2022 WL 2753475, at *8–9 (D.N.J. July 14,

2022) ("Plaintiff has offered no evidence demonstrating that 42 U.S.C. § 902(a)(3)'s removal

restriction caused the denial of her benefits claim or affected the determination of her benefits in

any way. . . . As such, further consideration from this Court on Plaintiff's 'separation of powers'

argument is not necessary. Accordingly, the final decision of the ALJ is not constitutionally

defective and remand is not warranted."); *Kwasnik v. Kijakazi*, No. 3:21-CV-08573, 2022 WL

2358424, at *8–11 (D.N.J. June 30, 2022) ("Plaintiff has failed to show a sufficient nexus

between the unconstitutional removal restriction and the ALJ's decision."); *Mor v. Kijakazi*, No. CV 21-1730 (JMV), 2022 WL 73510, at *3–5 (D.N.J. Jan. 7, 2022) ("Plaintiff fails to point to any connection between the Commissioner's removal under Section 902(a)(3) and the ALJ's decision (or any other action in this case.")). Nothing in Plaintiff's briefing in the instant case persuades this Court that the reasoning in these cases was erroneous. The Court therefore adopts that reasoning and concludes that Plaintiff has not established that remand is appropriate on this basis.

## VI.    CONCLUSION

For all these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**


Date:  September 8, 2023                  _____*s/Norah McCann King*_____
                                          NORAH McCANN KING
                                          UNITED STATES MAGISTRATE JUDGE